### GREAT SOUTHERN LIFE INS. CO. v. WILLIAMS et al.

#### No. 5085.

Court of Civil Appeals of Texas. Amarillo.

Nov. 27, 1939.

Rehearing Denied Jan. 2, 1940.

Frank Tatum, of Dalhart, Fred R. Switzer and Vinson, Elkins, Weems & Francis, all of Houston, and Small & Arney, of Amarillo, for appellant.

Otis Trulove and W. C. Vinyard, both of Amarillo, and E. E. Coons, of Texhoma, Okl., for appellees.

STOKES, Justice.

This suit was filed by appellees, Joseph L. Williams and his wife, and J. J. Dimmitt, Jr., against appellant, Great Southern Life Insurance Company, and others not necessary to mention, in which appellees sought to set off certain sums of money paid by them as principal, interest and commissions against a note or bond in the sum of $40,000, executed by them on July

2, 1928, which they alleged was usurious. The note was secured by a deed of trust on 6,751.8 acres of land, three-fourths of which is owned by Williams and one-fourth by Dimmitt.

The record is unusually voluminous but the following statement, we think, will reveal the facts and situation exhibited by it in a manner sufficient to make clear the conclusions we have reached with reference to the issues presented.

On January 20, 1925, appellees Williams and wife owned all of the land involved in the suit. They were indebted to various parties who held liens on the land and desired to procure a loan to take up a portion of the outstanding indebtedness. Williams informed one B. O. Taylor of his desire for a loan and Taylor recommended that he take the matter up with H. B. Dewey. The latter was, and for many years had been, engaged in the business of real estate loan broker and maintained an office at Amarillo where he lived. Appellee Williams explained to Dewey his situation and desire for a loan and was informed by Dewey that it would be necessary for appellee to fill out an application and that he believed he could procure a loan in the sum of $40,000 from the Great Southern Life Insurance Company. Dewey maintained in his office blank applications for loans which he had procured from Appellant and a number of other life insurance companies. He testified that he selected appellant in preference to other loaning agencies from whom he had on occasions also procured loans for his clients because appellant seemed more inclined to favor loans on ranches and large tracts of land. Dewey explained to Williams in this conversation that his brokerage fee or commission for assisting Williams in procuring the loan would be 10% of the amount of the loan. The negotiations finally resulted in an agreement that Williams would pay the brokerage commission and make an application to appellant for a loan on his ranch in the sum of $40,000, to bear interest at the rate of 7% per annum. The application was executed and forwarded to appellant by Dewey and resulted in an agreement that appellant would loan to appellees Williams and wife $35,000 instead of the $40,000 for which they had applied. B. O. Taylor usually made inspections and appraisements of lands upon which appellant and others contemplated making loans, and Dewey was instructed by appellant to have the land appraised by Taylor, which was done in company with Dewey and Williams. Taylor made his report upon the appraisement and Dewey then procured from appellees their abstracts of title, had them extended to date, and forwarded them to appellant for examination. After the titles were approved the loan papers were forwarded to Dewey for execution by appellees Williams and wife and they were executed on January 20, 1925. The obligations consisted of two notes for $2,500 each, due January 20, 1928, and January 20, 1929, and one note in the sum of $30,000, due January 20, 1935, and provided for interest at the rate of 7% per annum, represented by attached coupons. After the papers were executed Dewey had them placed of record and extended into a supplemental abstract and forwarded them to appellant's office at Houston. Appellant then disbursed the loan to the various creditors of appellees who held liens upon the land.

When the loan was closed Dewey agreed to accept notes of appellees for his commission of $3,500, secured by a second lien on the land, and four notes in the sum of $875 each, secured by a second lien in the form of deed of trust, were executed and delivered to him by appellees Williams and wife. After receiving these notes and second deed of trust lien, Dewey discovered that the Sinclair Company who held a second lien on the land would not subordinate its lien to that of Dewey's and that he would be forced to take a third lien on the land to secure his notes. He complained about this to appellee Williams and as a result the notes were cancelled and the $3,500 indebtedness rearranged by the execution of two notes in the sum of $250 each and four notes in the sum of $750 each, two of them falling due on February 20th of each of the years 1925, 1926 and 1927. A new deed of trust was given on the land to secure these notes.

After the $35,000 loan was closed Williams and wife conveyed to appellee, J. J. Dimmitt, Jr., an undivided one-fourth interest in all of the land. By July 2, 1928, appellees had again fallen into financial difficulties and were unable to pay the interest on the loan and other items of indebtedness owing by them to appellant and other parties and they applied again to Dewey to assist them in increasing the loan of appellant to $40,000. They had

paid $5,000 on the principal of the loan, thus reducing it to $30,000. The negotiations with Dewey, which were conducted by Williams, resulted in an agreement that appellees would pay Dewey $660 as a commission if he would procure an additional loan of $10,000 from appellant, thus increasing its loan from $30,000, the balance then due thereon, to $40,000. Dewey took the matter up with appellant and the application was declined. Upon being so informed, Williams procured Dewey to make a trip to Dallas and, if possible, induce appellant to increase the loan as applied for. Dewey made the trip, appellees paying his expenses, and his efforts resulted in appellant's agreement to increase the loan as desired by appellees. Dewey attended to the matter of extending the abstracts, having the new deed of trust executed and recorded and, after deducting the past due interest and other items owing to appellant by appellees, appellant sent to Dewey its check for $6,854.23, payable to appellees, and it was delivered to appellees by him.

Appellees alleged and contended in the trial court that both of the loans were usurious because 7% interest was charged in the notes and deeds of trust and, in addition thereto, they paid to Dewey who, they alleged, was the agent of appellant, the $3,500 commission on the first loan and $660 commission on the second loan, which payments, they contend, amounted to an additional charge for the use of the money which they borrowed from appellant and increased such charges to an amount greater than 10% per annum, thus tainting both loans with usury.

A jury was empaneled to try the case and at the close of the testimony appellant presented a motion for a peremptory instruction which was denied by the court and the case submitted to the jury upon special issues. After the verdict was returned both parties presented motions for judgment in their favor, the motion of appellant being overruled, and judgment for appellees was entered by the court upon the verdict of the jury, in which it was decreed that the loans were usurious and all amounts paid thereon, including the commissions paid to Dewey, were credited to the principal of the loan, thus reducing the indebtedness to the sum of $8,556.35, for which it was decreed appellant holds a valid lien.

Inasmuch as only two days of the term of court remained after the judgment was rendered, no motion for a new trial was filed by appellant, but it excepted to the judgment and gave notice of appeal which has been duly perfected.

The case is presented in this court upon a large number of propositions supported by twenty-six assignments of error, but in the view we take of the case it is not necessary to discuss more than one of the general contentions made by appellant. The controlling question in the case involves the action of the trial court upon appellant's motion for a peremptory instruction.

Appellant contends that the action of the court in overruling its motion for a peremptory instruction was reversible error because of which the judgment should be reversed and judgment here rendered in its favor. The motion was based upon the ground that there was no evidence in the case to the effect that H. B. Dewey was the agent of appellant or, if it could be said from the testimony that he was any sort of an agent, he possessed no more than special or limited authority and that appellant was not bound by his acts. It is contended, therefore, that the collection by him from appellees of the $3,500 as commission on the first loan and $660 as commission on the additional $10,000 procured under the second loan could not, under the law, be considered as compensation for the use or forbearance or detention of the money loaned to appellees.

There is no question that, if the notes which appellees gave to H. B. Dewey as commission are considered as charges made by appellant for the use of its money and are added to the 7% interest provided by the notes in the first loan, especially the two $750 notes that fell due the second year, it would extend the amount paid by appellees as compensation for the use of the money far in excess of 10%, the amount allowed by law to be charged as conventional interest and, therefore usurious. It is held by the courts of this state and practically all the other states of the Union that, as a general rule, when an agent of the lender charges and is paid by the debtor a commission or bonus in connection with a contract for a loan from his principal to a borrower and his action in doing so is ratified by the lender, the

transaction is usurious if the amount so paid, plus the amount charged and designated as interest, exceeds the amount allowed by law to be charged for the use or detention of the money. Dodson v. Peck, Tex.Civ.App., 75 S.W.2d 461; Fowler v. Equitable Trust Co., 141 U.S. 411, 12 S.Ct. 8, 35 L.Ed. 794.

■ The rule is also well established that when a lender makes usurious exactions of his debtor, even though they are made through a third person, they are considered the acts of the lender and it is immaterial whether such third person is his agent or not. The rule is based upon the acts of the lender and the effect of such exactions upon the borrower. Our statute is plain and explicit in its provisions that parties to any contract may agree to and stipulate for only such rate of interest as does not exceed 10% per annum on the amount of the contract. It is provided that all written contracts whatsoever which may in any way, directly or indirectly, provide for a greater rate of interest shall be void and of no effect for the amount or value of the interest. Art. 5071, R.C.S.1925. In order to enforce the spirit and purpose of the statute, the courts have established and consistently enunciated the rule that all exactions, by whatever term they may be designated, made by lenders of those who borrow money from them which have the effect of extending beyond 10% per annum the amount the borrower is required to pay for the use of the money borrowed, are considered as interest. Its purpose is to maintain the spirit of the statute and prevent ingenious arrangements under which borrowers in necessitous circumstances may be filched of exorbitant sums under the guise of incidental expenses and other pseudonyms.

■ In order to apply the rule, however, it must be shown that the exactions were made by the lender. Where it is sought to charge the lender with usury in transactions under which commissions are paid to third persons by borrowers it must be shown that the charge was made or exacted by the lender or 'that the third person was his agent. Amounts so paid by borrowers to third persons who are agents of the lender are considered payments to the lender because they are in effect payments of compensation, salary or expenses of the machinery through which the lender loans his money.

■ The rule is otherwise, however, where the agent merely acts as a broker for the borrower in procuring the loan for him. It has never been a violation of our usury laws for a broker or any third party to charge a fee or commission to procure a loan for a client who may desire one. The business or occupation of loan broker is one of long standing and the broker's right to charge reasonable commissions for his services to those in need of loans from third parties has long been recognized by the law. Stuart v. Tenison Bros. Saddlery Co., 21 Tex.Civ. App. 530, 53 S.W. 83; Leonard v. Smith, Tex.Civ.App., 99 S.W.2d 328; Trinity Fire Ins. Co. v. Kerrville Hotel Co., 129 Tex. 310, 103 S.W.2d 121, 110 A.L.R. 442.

■ Agency is a legal relationship which is based upon a contract, express or implied, of the parties or created by the law, by virtue of which one party is employed and authorized to act for another. The party so employed is the agent and the one who so employs him is the principal. Harkins v. Murphy & Bolanz, 51 Tex.Civ. App. 568, 112 S.W. 136. There is no contention in this case that H. B. Dewey was, by express contract either written or verbal, appointed by appellant as its agent. If an agency existed therefore it must be implied from the transactions and dealings that took place between them.

Dewey testified that he was representing Joseph L. Williams and working for Williams to obtain the $35,000 loan and that he was also working for Williams to obtain the renewal loan by which the indebtedness was increased to $40,000. His testimony was unequivocal and positive to that effect. He also testified that he charged appellees $3,500 for his services in assisting appellees in procuring the loans.

Appellee Williams testified that Dewey never made any statement to him as to whom he represented in getting the loan and that, in procuring the loan, he expected Dewey to "get out and do everything in his power to get the deal through." He said furthermore that he went to Dewey as a loan broker with the idea of getting him to take the application and assist in every way possible in getting the loan through. Williams further testified that he had

lived at Texhoma prior to taking up residence at Amarillo and, while living at Texhoma, he was engaged in the real estate brokerage business himself. He, therefore, was shown to be thoroughly familiar with the operations of real estate loan brokers and their relationship to lenders from whom they procured loans for their clients. He said that prior to making the application for this loan he knew nothing of the Great Southern Life Insurance Company; that he talked to B. O. Taylor about his indebtedness and that Taylor advised him to go to Dewey. He said at that time he did not know Dewey but that, on Taylor's recommendation, he went to Dewey and opened up negotiations with him. He said Dewey told him that he (Dewey) would try to get the loan and that he then agreed to pay Dewey 1% a year on a ten-year loan provided he got the loan. He said that was the compensation Dewey required and he was not to pay Dewey unless he got the loan. Williams' testimony shows that at no time during the negotiations did he consider Dewey the agent of appellant but that he recognized Dewey as a loan broker and considered the arrangements between Dewey and himself as being the relationship that ordinarily exists between a loan broker and his client.

H. B. Dewey testified that Williams came to his office in December, 1924, and discussed with him the matter of procuring a loan. He said he told Williams he would try to handle his loan and asked him for a financial statement which Williams gave him. He said that he told Williams he would charge him 10% on the gross amount of the loan and that he was to perform for Williams services which involved taking the application, transmitting it to the company, taking the company's inspector to the land, and if the loan was approved, procure the abstracts and have them extended to date, assist in correcting any defects in the titles, seeing that the papers were properly filed, and attending to other matters of detail that were necessary in order to complete the loan transaction. He said that he was representing Williams and working for him to obtain the $35,000 loan and the renewal loan and that he did obtain the loan for Williams in the sum of $35,000 and charged him for his services in doing so the sum of $3,500. He said that in doing this he was acting as Williams' agent.

A. C. Nicholson testified that he was manager of the investment department of appellant at Dallas and attended to some of the details of these loans. He said that appellant did not pay Dewey anything for the services he rendered in procuring or taking applications for loans; that the company and its officers understood Dewey was working for the borrower and assumed the borrower was paying him therefor.

W. S. Horne testified that he lived at Houston and was vice-president and treasurer of appellant; that prior to assuming that office he was secretary of the company and custodian of all of its records. He said that during the time he was secretary, which covered the period during which these two loans were made, there was never any order, resolution or motion passed by the board of directors of appellant authorizing or permitting any one to collect on its behalf any money from borrowers other than that which was provided by the loan papers themselves.

Other witnesses who were officers of appellant testified in the case but it was not shown by any witness that appellant, Great Southern Life Insurance Company, ever received any portion of either the $3,500 paid as a commission by appellees to Dewey when the first loan was procured or the $660 paid to him when the loan was increased to $40,000 or that it ever entertained any purpose or intention of doing so. There is no testimony in the record which indicates that appellant ever at any time had the intention to appoint Dewey as its agent or that it ever intended to recognize him as such. All of the witnesses who were connected in any way with the company maintained strongly that, while they assumed that Dewey was being paid by the borrower for his services, they dealt with him as an independent real estate loan broker and as the agent and representative of the borrower. Furthermore, Williams, who transacted all of the business on behalf of appellees, testified that the loans went through in a manner entirely satisfactory to him and that he had no complaint when the transactions were closed. After the loan was closed he wrote a letter to a friend of his at Ideal, Texas, who seemed to be in need of a loan, introducing H. B. Dewey to her, and stated in the letter that Dewey was able, if anyone was, to successfully negotiate a loan on her ranch. In the letter he said: "I wish to say for Mr. Dewey that, if possible

to put a loan through, he is able and competent in surmounting obstacles that defeat the average loan man. If you are ready to deal with Mr. Dewey, rest assured that he will look to your best interests in his dealings."

■ We think this testimony is conclusive to the effect that Dewey had no authority from appellant to make loans on its behalf and that he was in no sense appellant's agent. The record shows he had for many years maintained an office in the Blackburn Building at Amarillo and had upon his door a sign indicating his business was that of real estate loan broker. When clients appeared he would recommend that an application be made first to one company and then to another, depending upon which of them he thought would be most likely to be interested in extending the loan. Appellant not only did not participate in any of the commissions paid to Dewey by appellees but the record shows it did not know the amount he was charging them for his services. The case as presented by the record is simply that of a borrower employing a broker, who has no regular or established connection as agent with the lender and no arrangement of any kind for the payment to him of compensation for his services to effect loans. Such being the case appellant is in no respect chargeable with the acts and conduct of Dewey and the loans made by it cannot be tainted with usury by virtue of anything Dewey did in the matter nor by any amount that may have been collected by him from appellees as commission for representing them in the transactions. Appellees were, therefore, not entitled to recover and it was the duty of the court to grant the motion presented and urged at the close of the testimony and give to the jury a peremptory instruction to return a verdict in favor of appellant.

Appellees contend that the record shows beyond question that Dewey performed valuable services for appellant in procuring real estate loans as an investment of its surplus money; that he was at the time soliciting loans on behalf of appellant, using its blank forms, having them signed by prospective borrowers and forwarding them to the home office of appellant. They contend, further, that the record shows that other parties procured loans from appellant through Dewey and that Dewey wrote them in regard to making loans and in response to his letters they came to his office at Amarillo and negotiated loans from appellant through him. They further suggest that Dewey was in the habit of looking at the lands proposed to be offered as security for loans, taking the final papers to borrowers to be executed by them, and thereafter looking after the titles, receiving checks from appellant for the loans and delivering them to the borrowers. They point out further that the officers of appellant testified that they did not send out blank applications for loans indiscriminately but preferred that loans be submitted by men who were able properly and carefully to fill out the blanks and give information about the value of properties in the community; that they used discretion in selecting such men, and wanted intelligent men who could give them the information they needed in forming conclusions as to the advisability of extending loans. They say, furthermore, that it was shown they assumed the borrower was paying Dewey for his services and that Dewey was not working for nothing and that they availed themselves of his services with the knowledge and acquiescence that he was getting compensation therefor from the borrower. They suggest further that the commission notes and deed of trust were given in the first loan simultaneously with the notes and deed of trust representing that loan and that when the $40,000 loan was closed the check for $6,854.23, payable to Williams and Dimmitt, was forwarded to Dewey and he delivered it to them. They contend also that, after the $40,000 loan was closed and some interest thereon became delinquent Dewey was appointed substitute trustee by appellant and at its request he posted notices of sale under which he proposed to sell the land as provided in the deed of trust and thereby collect the entire indebtedness which became due under the accelerated maturity clauses in the notes. They point out that, although appellees arranged to pay the delinquences and reinstate the loan, Dewey charged $50 for his services in posting and removing the notices which appellant's officers insisted appellees should pay. They assert that these facts prove that Dewey was the agent of appellant in both transactions and that the charges made by him as commissions therefor should be classed as compensation paid to appellant for the use of the money appellees borrowed from it.

■ We cannot accede to these contentions of appellees. It is true the testi-

mony reveals that all of these things were done by Dewey but none of them amounts to more than that which a loan broker would be expected to perform in procuring for his client a loan from any lending agency. It is not shown that, in procuring loans for other clients, Dewey acted differently, or procured his compensation in a manner that differed in any respect from his acts and conduct in procuring the loans involved here. Nothing in the testimony indicates that Dewey was at any time the duly appointed agent of appellant in procuring applications for loans nor that, in procuring applications and closing loans made by appellant, he acted in any capacity other than that of an ordinary loan broker. The fact that appellant desired intelligent men to handle papers through which it advanced loans to borrowers and that it exercised discrimination in selecting parties to whom it sent its blank applications for loans fall far short of that which is necessary to appoint or designate an agent. It merely shows business discretion on the part of the officers of appellant and that they desired to avoid applications for loans being sent to them by loan brokers or others who were not familiar with the many intricate details of the important matters involved in loaning large sums of money.

After a considerable portion of the interest on the $40,000 loan became delinquent appellant wrote to Dewey and he, on a number of occasions, urged appellees to pay the interest and prevent foreclosure. Appellees contend that this shows his first duty was to appellant and that he was representing it. We do not see anything unusual in this conduct. It happened long after the loans were made and it is not at all strange that a loan broker would be anxious that loans which he had induced loaning agencies to make to his client be kept in good standing. His own business reputation as a loan broker would, to some extent, be involved and it would be but natural that he should be concerned about such matters.

As to the act of appellant in appointing Dewey as substitute trustee to post notices and make sale of the land after a portion of the interest became delinquent, it is sufficient to say that this also happened long after the loans were made and in consequence only of the fact that the regular trustee provided in the deed of trust was unable to perform the services placed upon him by its terms. This incident had nothing to do with the original transactions in which the loans were made. The fee of $50 charged by Dewey for the services rendered by him as substitute trustee constituted a charge for which appellees were liable under the specific provisions of the deed of trust. The insistance of appellant that appellees pay this fee to Dewey, therefore, is of no significance whatever.

Appellees urge that this case comes directly under the doctrine announced by the Supreme Court of the United States in the case of Fowler v. Equitable Trust Co., 141 U.S. 384, 12 S.Ct. 1, 5, 35 L.Ed. 786. We cannot agree with them in this contention. It is stated in that case that the "trust company established an agency at Springfield, Ill., for the purpose of securing loans upon real estate, and to that end constituted Johnston its agent. It made him a medium of communication between it and those in that locality who might wish to borrow money. It supplied him with the necessary blank forms, and expected him to make a report as to the sufficiency of the security offered. Of course it knew that no one would regularly perform the duties of such a position without reasonable compensation. That the agent might receive such compensation, the company came to an understanding with him at the outset that he must make the borrower pay for his services. With such an arrangement between it and its agent, the company need not be informed in any particular case of the amount the latter would exact from the borrower as compensation for effecting a loan; but it must be held to have known that the agent would not devote his energies and time to its business gratuitously, and would not forward to it an application for a loan, unless the borrower agreed to compensate him for his services. The services performed by Johnston, as its regular local agent, charged with the duty of receiving and forwarding applications for loans, with his opinion as to the sufficiency of the security offered, were of substantial value to the company, as much so as if they had been performed under an arrangement that the company should, out of the money loaned, retain for him the amount which, by previous agreement with the borrower, he was to receive as his compensation."

If the record in the instant case revealed that appellant had established an agency at Amarillo for the purpose of securing loans upon real estate and to that end had

constituted Dewey its agent and made him the medium of communication between it and those in that locality who might wish to borrow money, as the Equitable Trust Company did in the Fowler case, a situation would be presented entirely different from that which is shown by the record in this case. That such a distinction requires the application of different principles of law is well expressed by the court in the Fowler case in the following language: "It is not the case simply of a borrower employing a broker,—who has no regular or established connection with the lender as agent, and no arrangement with the lender in respect to compensation for his services,—to effect a loan, and agreeing to pay him commissions. With agreements of the latter kind the courts have no concern, and they are not permitted to affect the rights of the lender where he does nothing more than lend his money at such rate of interest as the statute permits."

See also Massachusetts Mut. Life Ins. Co. v. Boggs, 121 Ill. 119, 13 N.E. 550, by the Supreme Court of Illinois whose interpretations of the applicable law guided the Supreme Court in its consideration and decision of the Fowler case.

In our opinion the record before us is wholly lacking in any evidence to establish an agency on the part of Dewey in any respect. If, however, by some ultra-liberal or charitable construction it could be said that a semblance of agency was created, certainly it could not have been more than a special and limited authority that was conferred upon Dewey by appellant and it is well established in this state that the act of an agent having such limited and special authority only, in charging a borrower a fee or commission for making a loan and attending to the details of closing the same, is not the act of the lender and the amount so charged and collected by him does not render the loan usurious. Nevels v. Harris, 129 Tex. 190, 102 S.W.2d 1046, 109 A.L.R. 1464; Noel v. Panhandle B. & L. Ass'n, Tex.Civ.App., 85 S.W.2d 773; Sales et ux. v. Mercantile Nat'l Bank, Tex.Civ.App., 89 S.W.2d 247.

If, therefore, it could be said that such an agency was created and shown by any of the testimony, it did not have the effect of relieving the trial court of his duty to instruct the jury to return a verdict for the appellant.

We may say further that there is nothing in the record to indicate an intention on the part of appellant to charge usurious interest for the loan. We do not find any evidence which suggests that the arrangements as made were tainted with an effort to avoid the law pertaining to usury or cover up a design to collect more than was legally due for a legitimate loan. Our courts hold that a proper construction of a contract requires the presumption that the parties intended to observe the law and a contract for the loan of money should not be held usurious unless, upon a fair and reasonable interpretation, it was the manifest intention of the lender to charge and collect more interest than that which is permitted by law. Walker v. Temple Trust Co., 124 Tex. 575, 80 S.W.2d 935; Southern States Mortgage Co. v. Lykes, Tex.Civ.App., 85 S.W.2d 780; Shive v. Braniff Investment Co., Tex.Civ.App., 68 S.W.2d 564; Braniff Inv. Co. v. Robertson, 124 Tex. 524, 81 S.W.2d 45, 100 A.L.R. 1421.

From what we have said it is apparent that in our opinion the appellees were not entitled to recover, but that the trial court should have instructed the jury to return a verdict in favor of the appellants. The case seems to have been fully developed and thoroughly tried. We conceive no benefit that could accrue to any of the parties or purpose that could be served by another trial. The judgment of the trial court will, therefore, be reversed and judgment here rendered that appellees take nothing by their suit and pay the costs of the trial court and of this court.