## DONOGHUE v. STATE.
### No. 9718.

Court of Civil Appeals of Texas. Austin.
May 5, 1948.

Rehearing Denied May 26, 1948.

John D. Reed, Looney & Clark and R. Dean Moorhead, all of Austin, for appellant.

Price Daniel, Atty. Gen., and Willis E. Gresham, Martin Harris, and Ocie Speer, Asst. Attys. Gen., and Perry L. Jones, County Atty., of Austin, for appellee.

**624**

McCLENDON, Chief Justice.

In this opinion for convenience we shall use the initials FC to designate the Federal Finance Company; the initials ATSB and the Bank to designate the Avoyelles Trust and Savings Bank (a banking corporation chartered under the laws of Louisiana and located in the town of Bunkie, Avoyelles Parish, in that State); and the initials DP and DL to designate, respectively, discount paper and direct loan.

The suit was brought by the State, under art. 4646b, Vernon's Ann.Civ.St., Chap. 144, p. 227, Acts 48 Leg., 1943, Reg. Sess., sometimes referred to as "Anti-Usury Injunction Law," or "Loan Shark Act", against Donoghue (Mike E. Donoghue, d/b/a The Federal Finance Company) to enjoin violation of the usury laws of the State. The text of art. 4646b is copied in Watts v. Mann, Tex.Civ.App., 187 S.W.2d 917 (error ref.), in which validity of the article was upheld. In a trial to the court the judgment was for the State granting the sought injunctive relief, and Donoghue has appealed.

The controlling issue in the case is the correctness, vel non, of Donoghue's contention to the effect that the business (here involved) conducted by FC was that of loan broker, in which FC acted as the borrower's agent to procure the loan under FC's personal guarantee to the lender, for which services in procuring or "arranging" and guaranteeing the loan FC was paid a fee or commission by the borrower; that in no sense was FC the lender or the agent of the lender; and that FC's fees or commissions were not paid by or shared in by the lender, and did not constitute interest. In addition to "arranging" loans for borrowers, FC also dealt in automobile purchase notes which FC acquired from dealers. This phase of the business is not here involved.

The general principles of law relied upon by FC in support of its above contention are well established in this State. Substantially stated (with cited supporting authorities listed in the order of their citation) they are:

■ 1. Charges paid by the borrower to a broker or other third party as compensation for services in procuring a loan are not properly to be considered as interest in determining whether the loan is usurious. Great Southern Life Ins. Co. v. Williams, Tex.Civ.App., 135 S.W.2d 241 (error dismissed judgment correct); State v. Abbott Loan Service, Tex.Civ.App., 195 S.W.2d 416 (error ref. N.R.E.); National Life Ins. Co. v. Schroeder, Tex.Civ. App., 123 S.W.2d 374 (error dismissed); Eastern Mortgage & Securities Co. v. Collins, Tex.Civ.App., 118 S.W.2d 479 (error ref.); Trinity Fire Ins. Co. v. Kerrville Hotel Co., 129 Tex. 310, 103 S.W.2d 121, 110 A.L.R. 442; Leonard v. Smith, Tex.Civ.App., 99 S.W.2d 328; Sales v. Mercantile Nat. Bank, Tex.Civ.App., 89 S.W.2d 247; Noel v. Panhandle Building & Loan Ass'n, Tex.Civ.App., 85 S.W.2d 773 (error ref.); Adleson v. B. F. Dittmar Co., 124 Tex. 564, 80 S.W.2d 939; Hughes v. Security Building & Loan Ass'n, Tex.Civ.App., 62 S.W.2d 219; Hudmon v. Foster, Tex.Civ.App., 210 S.W. 262 (reversed on issue of pleading, Tex.Com.App., 231 S.W. 346).

■ 2. One may lawfully sell his credit by guaranteeing a loan, the compensation for which service is not properly chargeable as interest in determining whether the loan is usurious. Greever v. Persky, 140 Tex. 64, 165 S.W.2d 709.

■ 3. Reasonable charges paid by the lender to a special agent for special services rendered in connection with the loan are not properly classified as interest (though charged to the borrower) in determing whether the loan is usurious. See Sales, Noel and Hughes cases cited under principle 1, above; also Nevels v. Harris, 129 Tex. 190, 102 S.W.2d 1046, 109 A.L.R. 1464.

■ These relations, however, of broker, guarantor or special agent, compensation for whose services is charged to the borrower, must be bona fide, and not merely colorable "for the purpose of concealing a usurious loan." Greever v. Persky, above [140 Tex. 64, 165 S.W.2d 711].

FC's above contention is to the effect that the evidence conclusively shows that its ostensible relation of broker and guarantor for borrower in procuring or "ar-

ranging" loans in the transactions, and practices disclosed by the evidence, was a bona fide one; and that the judgment of the trial court predicated upon a contrary holding has no support in the evidence. It should be noted at the outset that it is not contended that loans in evidence were usurious unless FC's commissions or fees properly constitued a part of the interest thereon.

The salient facts on this issue are these: . Donoghue moved to Texas in 1945. He had previously conducted a small loan business in Covington, Kentucky. For about two years (1945-1947) he was engaged in that business in Texas. In June 1947 FC was organized, with Donoghue as general manager, its business being conducted in a rented building at 612 West 6th Street, in Austin. Advertisements on the windows and sign above the door read: "Auto loans arranged in 5 minutes $25 to $1500." An advertisement run in the Austin American-Statesman read: "Loans Quick as a Wink! Arranged in 5 minutes on Automobiles, Trucks, Furniture. Federal Finance Co. 612 West Sixth St. (Corner 6th and Rio Grande). Phone 7-3153. Mike Donoghue, Mgr." According to Donoghue's testimony FC was organized under the following circumstances: In June (all dates are in 1947) he was introduced to W. L. Caldwell, president of ATSB, by W.L. Allen (then a supervisor of a loan company) at San Antonio, where arrangements were made under an agreement (verbal at the time, but reduced to writing as of September 6, noted below), by which AT SB was to provide the funds for operation of the business, FC being without assets at the time. Just how the original amount necessary to start the business was provided is not shown. June 11, ATSB wrote the Austin National Bank guaranteeing drafts of FC up to $2,000 per day, and requesting that these drafts be sent direct to it. By like letter of July 18 this amount was increased to $4,000 per day. And by letter of July 26 the Austin Bank was requested to send these drafs to the Republic National Bank of Dallas, where they would be at once charged to the account of ATSB and credited to that of the Austin bank. June 24 an assumed name certificate of FC

was filed with the County Clerk of Travis County, under art. 5924, RCS, asserting that the "persons conducting or transacting such business, and their post office addresses are:" M. E. Donoghue, Austin, Texas, M. R. Firnberg, Bunkie, La., R. K. Caldwell, Baton Rouge, La., W. L. Allen, San Antonio, Texas, A. C. Caldwell, Dallas, Texas (street addresses were also given). This certificate was signed by each of these parties; was acknowledged the same day by Donoghue before the County Clerk of Travis County, and (purportedly) by each of the other four signers on the same day before Donoghue, as notary public of Travis County. Donoghue testified, however, that he never had met either of the two. Caldwells, and that so far as he knew none of his four co-signers had ever been in Travis County. R. K. Caldwell, in the employ of a banking corporation in Baton Rouge, and A. C. Caldwell, a retired postal inspector, were, respectively, a son and brother of the president of ATSB; of which Firnberg, a merchant in Bunkie, was a director. None of the other owners of FC was connected with ATSB. The written contract of September 6 between FC and ATSB is quite lengthy (10 letter-sized typed pages). It is necessary to state the substance of its pertinent provisions, which we will endeavor to do as briefly as clarity will admit:

It recites that the FC is engaged in the business of "acquiring installment payment obligations" (not here involved); and in that of "acting as agent and broker in arranging loans direct for customers, acting as surety, guarantor and/or endorser therefor, obtaining as security chattel mortgages for their protection on automotive vehicles (and other stated items of personal property), said loans hereafter referred to as 'Direct Loans' * * * and desires to act as agent for their customers in arranging loans, endorsing and guaranteeing said loans, with ATSB and said Bank is willing to make such loans, and for such time upon the terms and conditions stated herein," which were:

1. ATSB "agrees to make loans to customers as is acceptable to it and which bears the endorsement and guarantee" of FC, all to be on forms required by Bank

and appropriately secured by satisfactory lien; and to contain terms, conditions as to maximum amount and minimum terms required by Bank and comply with governmental regulations. "The purchase price, or advances made on such notes, shall be the face amount less the interest added thereto which shall be at the rate of 4% per annum, payable in monthly installments," plus $1 per each $100 or fraction thereof over $50, with minimum rate of $2 per note.

2. Relates to "Discount Paper."

3. "Discount Paper to be purchased by Bank and loans advanced by Bank shall be delivered by FC to Bank accompanied by schedule of installments if not shown in face of * * * note, and in form approved by Bank, and by all chattel mortgages or other security for such paper or loan, and other auxiliary or supporting documents relating thereto; including insurance policies, evidence of certificates of ownership. All * * * loan notes shall be properly indorsed by" FC, and assigned to ATSB.

4. Upon receipt of DP or DL, with stated supporting documents, ATSB "shall forthwith pay to" FC the amount according to above schedule. FC may transmit both DP and DL's to Bank by drawing sight draft on Bank with notes and documents attached; Bank being given ten days from payment of draft to determine whether same are acceptable to it, and FC "agrees to repurchase any DP or DL's found unacceptable by Bank upon demand at the" price paid therefor by Bank, plus "8% per annum to date of repurchase."

5. FC agrees (unless directed in writing by Bank) to following:

(a) "Immediately upon the remittance by (to) Bank of any item of paper from FC, FC shall indicate plainly on its" records, in manner satisfactory to Bank, that Bank or its assignee is owner of such paper or amount represented thereby.

(b) To handle all collections on DP and/or DL's, discounted or made direct, and indicate on its pertinent records all collections thereon, and remit to Bank daily or on day collected, without deductions of any kind whatsoever. In event of default by FC in any of its obligations under agreement Bank is given right to make other arrangements for collection of both DP and DL's.

(c) To report (giving stated details) to Bank not later than 10th of each month during life of agreement, all paper purchased, discounted or loaned direct by Bank on which any monthly payment was delinquent for more than 30 days as of last day of preceding month, or which, to knowledge of FC, is otherwise in any way in default.

6. FC agrees to "repurchase" from Bank all such paper in default for 60 days, and any item of paper shall be the unpaid face amount thereof, less unearned interest at 3% per annum. All such repurchases shall be made and payment remitted by FC without demand or notice from Bank, and FC shall immediately make entry on its records showing such repurchased paper to be the property of FC. Upon payment for such repurchase, Bank shall endorse such paper to FC without recourse "free and clear of all incumbrances by or through Bank."

7. FC warrants and represents that every note, whether DP or DL, forwarded and offered to Bank, "is and shall be the valid and enforcible obligation of the maker thereof in accordance with its terms and was acquired by FC in the ordinary course of its business."

8. This section authorizes representatives of Bank "and/or the bank examiners" to examine FC's records at any time during ordinary business hours; and, if required by Bank, obligates FC to furnish Bank: (a) a balance sheet showing FC's financial condition on last day of preceding month; and on each December 31 as long as loans made under the agreement should remain in hands of Bank or its assignee, a financial statement prepared and certified by FC's auditor; and (b) an income statement as of each of said dates covering operations of FC for preceding 12 months.

9. The agreement is made binding for one year from date with automatic extension thereafter "for a period of one year each," with the right of either party to terminate it upon 30 days written notice, and with the proviso that Bank shall have

the right of termination upon 10 days written notice whenever the total unpaid installments of all paper "covered hereby" then in default for 60 days shall equal 4% of all unpaid paper then held by Bank, or whenever FC shall fail to "take up and pay" 5 or more notes on which 2 or more installments are past due at Bank's request, or whenever total unpaid balance of all paper in default 60 days shall equal 10% of all paper held by Bank.

10. "Bank shall not be under obligation under this Contract to accept any DL for customers" of FC for over $400 secured by household furniture without first submitting it to Bank for approval; paragraph 4, however, may be applied to such loan.

11. FC agreed to guarantee all paper under the agreement to carry out which guarantee it is obligated: (a) to deposit under pledge U. S. bonds in amount equal at all times to 15% (or 25% at Bank's option) of all paper held by Bank; and (b) to deposit in a special account with Bank at end of each month 1% or more of all paper received by Bank from FC during the month, until this special account equals 5% of all paper held by Bank, and thereafter to maintain said deposit at such 5%.

12. FC agreed to make no agreement, verbal or written, with makers of DL or DP, which would bind Bank in any way, and FC shall have no authority to represent Bank in any way.

13. "This agreement shall be binding upon and inure to the benefit of the parties hereto and their respective successors and assigns."

The three transactions supporting the allegations that FC was "engaged in the business of habitually loaning money for the use and detention of which usurious interest has been charged" (art. 4646b, V. A.C.S.) were loans secured by liens on automobiles to the parties on the dates following: Porter, September 22; Smith, September 23; and Moseley, September 24. In each instance the borrower received $100 in cash, signed a "brokerage contract"; a draft which included the $100 plus "brokerage" charge ($27 each in Porter and Smith cases and $19 in that of Moseley), a note for the amount of the draft, plus $2.68, payable in four equal monthly installments (Porter and Smith, $32.42 each, and Moseley $30.42), and a chattel mortgage. The $2.68 presumably represented 4% per annum for four months on the draft, plus $1, as provided in the FC—ATSB contract. These instruments were all on printed forms, drawn in accordance with the contract. The "brokerage contract" stated that "the undersigned, having made application to you," FC, "a broker, engaged in the business of negotiating loans for prospective borrowers, to negotiate a loan for me in the sum of" ($129.68, Porter and Smith, $121.68, Moseley) "do hereby appoint you as my agent and attorney in fact to obtain said loan for me through any channels at your disposal, using application and any other information necessary to obtain loan. In the event you are successful" borrower agreed to pay FC a reasonable fee to cover also charge for guaranteeing loan, in agreed amount of $27 (Porter and Smith) and $19 (Moseley), which sum was payable "after the loan is finally negotiated and the proceeds thereof actually delivered to me. In the event you have cashed a draft for me upon a prospective lender and said lender refuses my loan or rejects to pay the draft" borrower agreed to promptly repay amount of draft, without interest less the brokerage charges. Borrower was given option of paying loan direct to lender, notifying FC thereof as guarantor, or paying direct to FC for transmission to lender. Finally, it was stated that FC as guarantor, "shall be interested in notifying me of any delinquencies in meeting payments due on the note." Each "Installment Note" was dated at Bunkie, La., and "the signers, makers, endorsers, guarantors, sureties" each jointly and severally promised to pay to the order of ATSB "or future holders" the above sums in four equal monthly installments with interest from maturity at 8% per annum (the highest non-usurious rate in Louisiana). It was payable "at the office of the lender and it is agreed that since the lenders have no agents elsewhere authorized to make loans or receive payments thereon, the balance at all times on the note will be the amount shown on the books of the holder and that the signers

hereof may remit to the holders directly by mail or otherwise as well as through brokers or agents of the signers." Each draft was dated at Bunkie, La., was payable to the order of and endorsed in blank by the borrower and drawn upon ATSB at Bunkie, La. The chattel mortgages recited that FC "acting for and as the agent of the undersigned, has by virtue of its unconditional endorsement and guarantee of the note herein described, secured from others a loan for the undersigned" followed by a recitation of the date, amount, maturity, etc., of the note. However, neither the payee nor the place of payment was stated. The mortgages were acknowledged before Donoghue, as notary public, but do not appear to have been registered. By endorsement of the same date as the mortgages they were assigned by FC to ATSB.

In each case the several instruments were executed simultaneously and the borrower was then paid $100 in cash, the time consumed in each transaction taking only a few minutes, except in one case where the borrower had to go home to get the certificate of title to his car. The regular course of business procedure between FC and ATSB was as follows: The loans arranged each day were transmitted to ATSB in a sealed envelope on the back of which was a "master" draft in the gross amount of all individual drafts, which, together with the notes and mortgages were enclosed in the envelope. The draft was then cashed by the Austin bank and the proceeds either delivered to FC or deposited to its account. The draft was not deposited for collection, but was forwarded direct to the Dallas Bank, where it was credited to the Austin Bank and debited to ATSB, as stated above. ATSB's president testified that his bank did a similar business in some five or six states; that it had similar arrangements with more than 25 small loan concerns in Texas, and that it had outstanding more than a million such loans. Donoghue was not interested in any of these, except FC and the one at San Antonio, operated by Allen. He testified that the overhead of FC was in excess of $500 per month; that the U. S. bonds on deposit in the guaranty trust fund at the time of the trial (mid December) amounted to $15,000; and the

guaranty special account to $1,500; and that the loans then held by ATSB under the agreement were over $100,000. So far as the record showed ATSB had never refused to accept any loan sent in by FC, and no collections had been made on any of such loans except by FC. The amount which each borrower received was paid in cash from a revolving fund kept in FC's place of business.

W. K. Joffrion, of Marksville, parish seat of Avoyelles Parish, 20 miles from Bunkie, testified: He was a director, an "inactive" vice-president, and the attorney for ATSB and of Finberg. As to the contract between FC and ATSB, he "drew part of it and part of it was submitted to me and I worked back and forth with it." He was not certain whether the contract was already prepared when sent to him "because I have drawn some and then they have been sent back to me changed and for my approval, and I made changes and sent them back, and finally the contract is accepted, and so I would not be exactly positive what parts I have drawn and what I haven't." In his opinion the loans in issue were made and consummated in Bunkie. "That was the intention when we drew the contract, that all transactions would be consummated in Bunkie, and we tried to put sufficient provisions in there that it would only be governed by the State of Louisiana laws." According to which these loans were legal, since under Louisiana Supreme Court decisions, a note was not usurious which did not show on its face a rate of interest in excess of 8% per annum. He did not pretend to know anything about the laws of Texas. Donoghue, in his opinion, was not the agent of ATSB.

That the arrangement between FC and ATSB was in fact and in effect a scheme, under color of legal formalities, to conduct a small loan business in Austin, Texas, in circumvention of our usury laws (a business highly profitable to each of the contracting parties) is palpable. A business of this character could not have been successfully operated except upon the basis that for all practical purposes the loans were consummated as to the borrower when he signed the instruments required of him, and got the amount he wanted to

borrow. All of these instruments were upon printed forms approved by ATSB. The following provisions in the contract and these forms were clearly colorable for the purpose of evidencing an ostensibly legal transaction under Texas laws; those of the contract that ATSB be given ten days from payment of draft to determine. whether the loans were acceptable (all that was done or contemplated under this provision was a check of the notes and accompanying papers to see whether they were in accordance with the agreed specifications); all those of the "brokerage contract" purporting to make FC agent of borrower to "arrange" a loan; those of the note making it payable at ATSB at Bunkie, with "privilege" in maker to make payment through some agent of his. Also at all times the notes were under virtual control of FC. It attended to procuring the loans, examining the security, sending notices to borrowers and making collections. It had the right, under stated conditions, and agreed, under certain other conditions, to "repurchase" (a term probably inadvertently used) direct loans, upon stated terms, ATSB agreeing to endorse them to FC without recourse.

■ For all practical purposes, as between the parties to the contract, FC was conducting a loan business at the designated place in Austin, which was financed by ATSB, under agreement by which loan notes, meeting agreed specification, were hypothecated with ATSB to secure the amount of its advances to FC; the amount of ATSB's compensation for use of its money being measured by the provisions of the loan notes, guaranteed by FC. The arrangement contemplated a continuing one; which it needs must be to be profitable to both parties.

The provisions of the contract, for the guaranty trust fund and special deposit; for constant check, inspection, and virtual right of supervision of the business by ATSB, in effect constituted the business a joint adventure between FC and ATSB. According to our calculation, interest yield to ATSB on its outlay in the three notes in evidence, payable as they were, ¼ each month, was approximately 10% per annum;

that on the two $129.68 notes slightly under, and that on the $121.68 loan slightly above that rate. If the charges of FC be added this rate would be increased enormously. We think it unnecessary to attempt a further analysis of the arrangement. It is clear that neither party could legally have conducted the business alone, and that arrangement was a palpable scheme to circumvent the Texas usury laws. If this arrangement were upheld the Texas usury laws as affecting the small loan business might as well be abolished.

The other points urged by FC may be reduced to two contentions:

■ 1. The loan to Smith was not usurious, for the reason that he testified he had no intention of making a usurious loan or paying usurious interest, citing the following quotation from Wellfare v. Realty Trust Co., Tex.Civ.App., 85 S.W.2d 1067, 1069 (error refused): "It is a rule of law well recognized in this State that in questions of usury the matter of intention of the parties is controlling."

This expression was used in connection with the interpretation of a contract of doubtful meaning, the court adopting that interpretation which would render the contract legal, that is non-usurious. There is no question of interpretation here. The issue is whether the loan contract, evidenced by the several instruments, was in fact, under the FC—ATSB contract, business arrangements, and practices, a mere disguise under ostensible legal forms to conceal the busines of charging and collecting usurious interest. Smith's testimony, in this respect, was to the effect, to quote from FC's brief, "that he entered into the transaction with appellant not because he desired a loan, but because the editor of the Texas Ranger, a University publication, asked him to go through the motions of obtaining a loan through appellant to serve as a basis for a story to be published in that publication." Smith's motives had nothing to do with the validity or legal effect of the transaction, and could not have been successfully urged as a defense to defeat enforcement of the obligations he had incurred therein.

■ 2. The other contention, variously expressed, is in substance the same as that

630

made in Watts v. Mann, under fifth contention, syllabus heading 36, on page 928, of 187 S.W.2d, to the effect that the business here involved is commerce between the states in which Congress has preempted the field, and as to which state usury laws are ineffective; citing, United States v. South-Eastern Underwriters, Ass'n, 322 U.S. 533, 64 S.Ct. 1162, 88 L.Ed. 1440. For the reasons stated in the Watts v. Mann opinion (error refused) the contention is overruled.

The trial court's judgment is affirmed.

Affirmed.