**SAPPHIRE HOMES, INC., et al., Appellants,**

**v.**

**Ben M. GILBERT, Trustee, Appellee.**

**No. 17012.**

Court of Civil Appeals of Texas.

Dallas.

Feb. 23, 1968.

Rehearing Denied March 22, 1968.

Henry D. Akin, of Akin, Gump, Strauss, Hauer & Feld, Dallas, for appellants.

Kleber C. Miller and M. Earl Rutledge, of Shannon, Gracey, Wright, Ratliff & Miller, Ft. Worth, for appellee.

BATEMAN, Justice.

This is a suit to recover double the amount of alleged usurious interest paid by Bessemer Forging Company, hereinafter called "Bessemer", on a certain loan transaction. Bessemer sued Chill Juice, Inc., a corporation, Sapphire Homes, Inc., a corporation, which will be called "Sapphire" herein, Barns Lumber Company, a partnership consisting of J. M. Barns and C. A. Barns, and J. M. Barns and R. F. Daniels, individually, alleging that they conspired and acted in concert to charge Bessemer an illegal, usurious rate of interest on the loan, but which would have the semblance of a valid, legal transaction, in that it would be made to appear that Chill Juice would lend $120,000 to Bessemer, of which amount Bessemer would pay $20,000 to Sapphire for its "services" in procuring the loan for it and endorsing or guaranteeing payment of the same, and that an attorney's fee of $5,000 would be paid to attorney Harmon L. Watkins; but that in truth the $20,000 fee to Sapphire, the $5,000 fee to Watkins and the 5½ per cent per annum interest specified in the note, all constituted "interest," as that term is defined by statute, and greatly exceeded the maximum of 10 per cent per annum allowed by law.

During the pendency of the suit Bessemer became bankrupt and its trustee, Ben M. Gilbert, was substituted as plaintiff. At the conclusion of a nonjury trial, the

trial court rendered judgment for appellee against Sapphire, Chill Juice, J. M. Barns and Ralph Daniels, jointly and severally, in the sum of $48,176.68 (double the $20,-000 "fee" paid to Sapphire and $4,088.34 representing the 5½ per cent interest paid on the note, but not taking into consideration the $5,000 fee to Watkins).

The court filed findings of fact and conclusions of law. It found that one Morris, a certified public accountant, learned that Bessemer sorely needed a large loan to avert imminent foreclosure on its physical assets, and was told by one Snell, another C.P.A., that he had a client who might make a loan for the 20 per cent interest which the borrower was willing to pay; that Snell presumably contacted Barns, who said he was interested in becoming a party to the loan for the "finder's fee," and who presumably contacted Watkins and asked him to take care of the legal matters; that upon learning that Snell wanted a corporate charter to use in making the loan Morris told him of Chill Juice, Inc., which had never functioned as a cor-poration, had no financial background, its nearest approach to having any capital being a check for $1,000 which never left the possession of the maker; that Barns heard of Chill Juice for the first time on the day the loan was closed, which was the first time Morris learned that Sapphire was to be the recipient of the $20,000, which is variously denominated in the record as the "endorsement fee" and the "finder's fee"; that Sapphire had debts which exceeded its assets; that the Republic National Bank, in lending the money, which was in turn loaned to Bessemer, did not consider the credit of Chill Juice or Sapphire but relied on the financial backing of Barns Lumber Company and Daniels; that out of the proceeds of the $120,000 loan the title company paid $20,000 to Sapphire, $5,000 to Watkins, and $95,000 to Bessemer; that the $5,000 fee was paid to Watkins voluntarily by Bessemer for his services in checking the legal features of the loan and advising that the $20,000 "brokerage fee"

was proper, and was not an "exaction" of any of the defendants; that Bessemer paid $124,088.34, of which $24,088.34 was interest, which exceeded 10 per cent; that Daniels and Barns required the $20,000 to be paid as a condition for making the loan, and that the recipient of the actual benefit of the loan was a selectee of theirs; that in reality Barns and Daniels used the corporate entities as lending and endorsing agencies when there was no factual support in actuality for such manner of handling, and that such was done to give the loan an appearance contrary to actualities; that Sapphire was neither a finder which would justify charging a finder's fee, nor was it an arm's length transaction for it to support the loan with credit which did not in fact exist; that Republic National Bank issued its check for $120,000 to Chill Juice and the title company disbursed the proceeds after Chill Juice endorsed it; that the note executed to the bank and the note executed by Bessemer each bore 5½ per cent interest, which was paid by Bessemer and the bank was the actual recipient thereof, having been the entity that provided the sum loaned; that the $20,000 paid to Sapphire was not for services as agent for Bessemer in finding a lender in the person of Chill Juice but was a spurious transaction to cloak the loan with an aspect other than that which actually existed; that Fort Worth National Bank paid Republic National Bank $124,088.34 as proceeds of the loan made to Bessemer; that the $4,-088.34 paid in interest on the note for $120,000 was paid by Bessemer as interest on its note and in turn passed to Republic Bank in discharge of the obligation to it.

The trial court's conclusions of law were that Barns and Daniels are liable to appellee for the $20,000 paid by Bessemer because their nominee (agent) Sapphire received that amount as interest, and because they made the loan for the $20,000 which was offered by the borrower as compensation for the loan in addition to the 5½ per cent interest, and having exacted such amount are answerable for having charged

usurious interest, though their nominee Sapphire was the actual recipient, and are liable for the $4,088.34 paid as accrued interest, though such amount was received in the final analysis by Republic Bank, because they first received it and by their own design used it to discharge their interest obligation as guarantors to the bank; that they are liable for all interest paid by Bessemer because they exacted the payment thereof, and because their agents, Morris and Snell, and particularly Snell, "designedly used corporate entities to give the transaction an appearance which would exempt the application of penalty provisions of the law," and the corporations were not bona fide participants in that they lacked substance; that Chill Juice and Sapphire are liable for the interest paid by Bessemer because they were parties to an unlawful exaction of usurious interest; that Barns and Daniels are not liable for the $5,000 paid to Watkins because it was not established that such fee was not voluntarily paid by Bessemer, nor was it shown that it was exacted by such defendants or that they profited therefrom; that Barns Lumber Company, a partnership, is not liable for any amount because it was not shown who the partners were at the time in question.

Those defendants against whom the judgment was rendered now appeal on five points of error. By two cross points the appellee complains of the action of the trial court in excluding the $5,000 fee paid to Watkins from consideration in assessing the damages.

The statutory penalty for exacting and receiving usurious interest is the award of double the amount of such interest to the one paying the same.*

It would unduly and unjustifiably lengthen this opinion to summarize the 380 pages of testimony and 49 exhibits. In our opinion, they do support the court's findings

and conclusions. Most of the facts are undisputed. Bessemer, being in desperate financial straits and facing foreclosure on its assets, was willing to pay 20 per cent in addition to normal interest charges if it could obtain a loan of approximately $100,000. It was not a desirable loan, from a lender's point of view, at a lawful rate of interest. Barns and Daniels were successful business men, one engaged primarily in the lumber business and the other in construction. They apparently had excellent credit standing at the Republic National Bank of Dallas. The accountants, Morris and Snell, knew of Bessemer's plight and presented the matter to Barns and Daniels as an opportunity to make some money. When Snell first talked to Barns about it Barns told him that Barns Lumber Company was not in the finance business but that if Sapphire could guarantee the loan and get a guarantor's fee "something might be worked out"; that he was interested in it if he could arrange it so Sapphire could make some money out of it.

Sapphire was a Florida corporation. All of its stock was owned in equal shares by Barns and Daniels. It had been losing money and its assets were less than its debts. It was not in the business of either lending money or guaranteeing the obligations of others. It was not shown to have had any previous dealings of any kind with Bessemer. If Barns and Daniels were to lend the money to Bessemer, it would seem incongruous, to say the least, for their own corporation to guarantee to them that Bessemer would repay the loan. Moreover, regardless of who owned Sapphire, the guarantee by an insolvent corporation would be of no value to the lender. Sapphire was clearly not the "finder" of the loan and would therefore not be entitled to charge Bessemer a "finder's fee."

In view of their ownership of all of Sapphire's capital stock, it was doubtless

---

* Article 5073, V.A.C.S., in effect at the time of these transactions, was repealed effective October 1, 1967, and its provisions are now embodied in Article 5069—1.06, Vernon's Ann.Civ.St.

considered advisable, if not necessary, for some person or entity other than Barns and Daniels to appear as the lender. One of the accountants had in his files the charter of Chill Juice, Inc., a Texas corporation which had never actually had any capital and had never transacted any business. The accountant offered to let this corporation be used as the lender. Having no money whatsoever to lend, Chill Juice was put through the formality of borrowing .$120,000 from the Republic National Bank at 5½ per cent per annum, and simultaneously lending the same amount, at the same rate of interest, to Bessemer. Chill Juice, of course, having no assets or credit, could not have borrowed the money from the bank on its own unsecured note, but the bank was willing to lend the money to Chill Juice if Barns and Daniels would guarantee its repayment. Barns and Daniels executed a written guarantee, and primarily on the strength thereof the Republic Bank issued its cashier's check to Chill Juice for $120,000. Several months, later, Bessemer obtained a loan from the Fort Worth National Bank and out of the proceeds thereof the principal and accrued interest due on Bessemer's note to Chill Juice were paid directly by the Fort Worth bank, at Bessemer's direction, to the Republic Bank, which then held Bessemer's note as collateral to Chill Juice's note.

The trial court concluded from this evidence that the roles played by Sapphire and Chill Juice in this series of transactions were purely chimerical, and that by looking through the form of the transaction to the realities thereof Barns and Daniels were shown to be the real lenders and that by making the payment of the $20,000 to their wholly owned corporation a condition to their making the funds available to Bessemer, they exacted a payment "for the use or forbearance or detention of money" that was clearly usurious. Articles 5069 and 5071, V.A.C.S., then in effect; now Articles 5069–1.01 and 5069–1.04, V.A.C.S.

By their first point of error on appeal the appellants complain of the holding by the trial court that the $20,000 received by Sapphire was interest received or collected by Sapphire for the use, forbearance or detention of money. It is argued that compensation paid to a third party for services in procuring a loan for the borrower, or for selling or lending his credit to induce the lender to make the loan, does not come within the statutory definition of interest.

■ One of the cases most strongly relied on by appellants is Donoghue v. State, 211 S.W.2d 623 (Tex.Civ.App., Austin 1948, writ ref'd n. r. e.). In that case these well known rules were announced: that charges paid by a borrower through a broker or other third person as compensation for services in procuring a loan are not properly to be considered as interest in determining whether the loan is usurious, that one may lawfully sell his credit by guaranteeing a loan, the compensation for which service is not properly chargeable as interest in determining whether the loan is usurious, and that reasonable charges paid by the lender to a special agent for special services rendered in connection with the loan are not properly classified as interest (though charged to the borrower) in determining whether the loan is usurious; but it was also held that these relations of broker, guarantor or special agent *"must be bona fide, and not merely colorable 'for the purpose of concealing a usurious loan.'"* (Italics ours.)

To the same effect is Greever v. Persky, 140 Tex. 64, 165 S.W.2d 709 (1942), also relied on by appellants. Both *Donoghue* and *Greever* might be cited in support of our decision on this point.

The only other case cited by appellants under this point is Dewey v. American Nat. Bank, 382 S.W.2d 524 (Tex.Civ.App., Amarillo 1964, writ ref'd n. r. e.). In that case, it was undisputed, and the jury found, that the third party, to whom the borrower agreed to pay a finder's fee, actually did influence the lender to make the

loan, and the lender received no part of that fee. The facts are therefore so dissimilar to those in the case at bar that we do not consider the case to be in point.

■ We hold that there is no evidence that Sapphire or its officers actually produced or found the lender in this case, or that the signing of Sapphire's name to Bessemer's note payable to Chill Juice was done in good faith pursuant to an agreement that it was actually selling or lending its credit for an agreed compensation voluntarily paid by Bessemer. The evidence is to the contrary. Appellants' first point of error is overruled.

■ By their second and third points of error appellants complain of the trial court's action in holding Barns and Daniels individually liable for double the amount of the $20,000 received by Sapphire. They argue thereunder that the usury statutes penalize only him who actually *receives* the usurious interest, that Barns and Daniels did not *receive* any part of the $20,000 which was paid to Sapphire and there is no ground on which to pierce the corporate veil; but if the corporate veil should be pierced, then that Barns and Daniels would be entitled to a fee for their services in producing a lender for Bessemer and for lending their credit to Bessemer. We do not agree with appellants.

Ever since the adoption of the Texas Constitution of 1876, the public policy of this state has denounced the exacting and collecting of usurious interest. If a person desiring to make a loan of money at a usurious rate of interest could avoid his liability for the statutory penalty by simply directing a large part of the exaction to be paid to a corporation, all of whose capital stock is owned by him, and particularly if that corporation were insolvent, the usury laws might as well be repealed.

As stated in Temple Trust Co. v. Sewell, 133 Tex. 417, 126 S.W.2d 943, 947 (1939):

"The courts will diligently look through the form of a transaction to discover illegal interest and protect the borrower from its consequences, but they will not be diligent to treat a carefully-planned disguise as other than what on its face it purports to be, and was intended to be, merely to save the lender from his usurious act."

See also Standard Supply & Hardware Co. v. Christian-Carpenter Drilling Co., 183 S.W.2d 657 (Tex.Civ.App., Galveston 1944, writ ref'd); Schmid v. City Nat. Bank of Wichita Falls, 132 Tex. 115, 114 S.W.2d 854 (1938); Independent Lumber Co. v. Gulf State Bank, 299 S.W. 939, 942 (Tex. Civ.App., Galveston 1927, writ ref'd); Graham & Locke Investments v. Madison, 295 S.W.2d 234, 243 (Tex.Civ.App., Dallas 1956, writ ref'd n. r. e.); and F. B. & D., Inc. v. Nathan Alterman Electric Co., 394 S.W.2d 821, 823 (Tex.Civ.App., San Antonio 1965, writ ref'd n. r. e.), wherein it was said that our anti-usury statutes "have as their purpose the prohibition of usury *under any cover or pretext whatever.*" (Italics ours.)

The opinion of our Supreme Court in Stacks v. East Dallas Clinic, 409 S.W.2d 842 (Tex.1966), is not contrary to this view. In fact the court there said: "This Court will look through the form to the substance of a transaction; and the substance here bears out defendant's contention that it only collected the interest for another, and received no benefit from such interest itself."

Appellants argue that there were no grounds shown here for disregarding the fiction of corporate entity and holding Barns and Daniels liable for interest received by Sapphire. However, it has been held that the fiction may be disregarded where it is used to circumvent a statute or to justify wrong. 14 Tex.Jur.2d, Corporations, § 12, p. 131; First Nat. Bank in Canyon v. Gamble, 134 Tex. 112, 132 S.W.2d 100, 103, 125 A.L.R. 265 (1939); Houston-American Life Ins. Co. v. Tate, 358 S.W.2d

645, 656 (Tex.Civ.App., Waco 1962, no writ), which cites with approval Pacific American Gasoline Co. of Texas v. Miller, 76 S.W.2d 833, 851 (Tex.Civ.App., Amarillo 1934, writ ref'd), wherein the court said "* * * a court of equity leaves itself open to the charge of downright gullibility if it closes its eyes and refuses to look through the shadow of a fictional corporate existence to see and ascertain its real ownership, to prevent fraud and protect legal rights."

We think that this record clearly supports the trial court's findings that Barns and Daniels were actually the lenders and that they were using their wholly owned corporate entity, Sapphire, to circumvent the anti-usury statutes and to justify the exaction of usurious interest, which is a "wrong" in that it contravenes well settled public policy. Accordingly, appellants' second and third points of error are overruled.

■ By their fourth point of error appellants say the trial court erred in holding Chill Juice liable for double the amount of $20,000 received by Sapphire.

This corporation, empty shell though it may have been, did actually participate in the scheme to place a cloak of respectability over the usurious transaction, and in our view it was properly held jointly and severally liable with the other participants therein. Appellants' fourth point of error is overruled.

■ By their fifth point of error on appeal, the appellants say the trial court erred in holding them jointly and severally liable to appellee for double the amount of the $4,088.34 in interest which was received and collected by the Republic National Bank of Dallas from the Fort Worth National Bank. They say there is neither pleading nor evidence to support this holding. We see no merit in this point.

The pleadings on this point, while in somewhat general terms, are in our opinion sufficient to support the trial court's findings and conclusions. The evidence shows clearly that Bessemer's note payable to Chill Juice was held as collateral by Republic National Bank at the time Bessemer borrowed the funds from the Fort Worth National Bank to take up the former obligation, and that in disbursing the proceeds of its loan the Fort Worth bank paid the amount of principal and interest due on Bessemer's note payable to Chill Juice directly to the Republic National Bank, which held it. Chill Juice and its guarantors, Barns and Daniels, "received" the money by benefiting from its payment to the bank in that such payment discharged their obligation to the bank which happened to be in the same amount. The fifth point is overruled.

■ By two cross points appellee complains of the failure of the trial court to find that the $5,000 fee paid to Watkins was also interest exacted of Bessemer and to include it in the damages awarded to appellee. These cross points are without merit.

Lenders often require borrowers to pay expenses incurred by the lenders in connection with loans, such as title policy premiums, recording fees, costs of supplemental abstracts and attorneys' fees. When such expenses are actually incurred and they are paid in good faith to those furnishing the services, and no part of the payment is received by the lender, they are not properly classified as interest in determining whether the loan is usurious.

There was ample testimony to warrant the court's action in this respect. Watkins' own testimony was to the effect that this fee was for services he actually rendered as Barns' and Snell's attorney in connection with the loan, and there was no evidence to the contrary.

However, appellee argues that Barns and Daniels received the benefit of the $5,000 paid to Watkins just as much as they received the benefit of the $20,000 paid to Sapphire and the $4,088.34 paid to Republic

National Bank. We do not agree with appellee. The difference lies in the fact that the $20,000 was paid to a corporation which was wholly owned by Barns and Daniels and which actually rendered no service to them or to Bessemer, and in the further fact that the payment of the $4,088.34 not only extinguished Bessemer's obligation to Chill Juice for the 5½ per cent interest due on that note, but also satisfied the similar obligation of Chill Juice, which had no assets or credit whatever, but which Barns and Daniels had guaranteed. The direct benefit to them from those payments is obvious, but no such benefit accrued to them from the payment of the Watkins fee. Both of the cross points are overruled.

The judgment appealed from is

Affirmed.