

# THE ATTORNEY GENERAL
## OF TEXAS

October 1, 1987

**JIM MATTOX**
**ATTORNEY GENERAL**

Honorable John R. Hale                   Opinion No. JM-802
Commissioner
Credit Union Department                  Re:    Conditions under which a
914 East Anderson Lane                   a credit union may make certain
Austin, Texas  78752-1699                loans to insiders

Dear Commissioner Hale:

You request an opinion on the application of a provision in the Texas Credit Union Act to certain situations that may arise in the day-to-day operation of a credit union subject to supervision by your department. Specifically, you cite section 7.02 of the Act which provides:

> No credit union may make a loan or aggregate of loans to any one member, including loans to the member's business interests, in an amount greater than 10 percent of the credit union's total assets or a lesser amount established by commission rule.

V.T.C.S. art. 2461-7.02. This provision is sometimes referred to as the "ten percent loan limit" or simply "the loan limit." You describe your understanding of the purpose and effect of the provision as follows:

> The limitation is significant in the early development of a credit union and diminishes as assets increase. An average size credit union now has assets of about $7 million; therefore, the 10% limit is seldom a factor in credit decisions because very few credit unions would loan $700,000 (assuming assets of $7 million) to any one member, because of obvious risks, availability of funds, and perhaps natural caution and inexperience in considering a transaction of that magnitude. The limitation rarely is violated, particularly in larger credit unions.
>
> It is assumed that the legislative intent was to protect a credit union from abuse by insiders during early development and sufficient safeguards

would evolve as the credit union grows.  It is also assumed that a 10% limitation on a credit union of $100 million in assets was never intended to provide a legal opportunity for a single member to borrow $10 million.

However, circumstances could arise where the 10% limitation is indirectly exceeded.  For example, a member of a $1 million credit union may be loaned $70,000 to finance a home.  Soon thereafter the member may cosign a loan for $50,000 to another member.  In this situation the borrower is directly indebted for $70,000 with a contingent liability of $50,000, the aggregate $120,000 exceeding 10% of assets.

In another case, in a $1 million credit union, two members may want to borrow $120,000 and secure the indebtedness with real property of sufficient collateral value.  Since neither member could borrow more than $100,000 without exceeding the 10% limitation, each may seek to borrow $60,000 and use the same property to secure both loans. Each borrower could limit his liability by obligating himself for only $60,000, or they could cosign each other's loan and become contingently liable for $120,000.

Using the same figures from the preceding example, they may seek to form a partnership and borrow the full $120,000 through the partnership (assuming the partnership entity is a credit union member). In this instance, they may seek to limit personal liability for a set amount, e.g. $60,000 for each of the two partners, or they could assume full joint and several liability.  There are innumerable variations to these examples.

This office has previously considered the application of article 2461-7.02 to another factual situation.  In Attorney General Opinion MW-524 (1982), we noted that article 2461-7.02 is subject to the specific statutory authority of the credit union commissioner.  We stated that it was a matter for the credit union commissioner to determine whether a particular loan practice violates the provision:

> The credit union commissioner has specific statutory authority to determine whether a partic- ular practice by a credit union violates the Credit Union Act.  V.T.C.S. art. 2461-5.09(a)(1),

> (2). This power to find violations necessarily implies the power to decide whether a particular practice is, in fact, violating the act, and consequently involves interpretation of the act itself. As with all administrative adjudications, the commissioner's decision as to whether article 2461-7.02 is violated involves interpretation of the scope of that article. Therefore, it falls under the primary jurisdiction of the commissioner to determine whether, under applicable standards of law, an aggregation of loans to a member and a corporation controlled by that member violates article 2461-7.02.

Attorney General Opinion MW-524 (1982). Thus, your office has the responsibility for issuing interpretations of the loan limit rule. We are prepared to discuss some of the factors which you may wish to consider in formulating regulations to enforce the prohibition in article 2461-7.02. We note that answers to the hypothetical questions you pose may turn on precise factual determinations which may vary from case-to-case. Accordingly, our discussions must be taken to be only tentative: You must, as a part of the duties of your office, decide how to deal ultimately with the application of article 2461-7.02 to the many situations which are likely to confront any credit union.

We will set out each of the questions you pose to us, and follow it immediately with a discussion of some of the points of law which may be relevant to your consideration of any necessary rules or regulations.

Question One: May a credit union loan six percent of its assets to a member and six percent of its assets to the member's spouse who is also a member?

Discussion: The answer to this question will depend on a number of factors, none of which can be assumed in advance. Specifically, in any given situation, reference will have to be made to the principles of marital property law, a sometimes arcane, and always complex, subject. The Texas Family Code, at sections 5.01-5.87, contains an extensive set of provisions that needs to be consulted, along with pertinent judicial interpretations, before the effects of a particular transaction can be gauged with certainty. For example, section 5.61 provides

> (a) A spouse's separate property is not subject to liabilities of the other spouse unless both spouses are liable by other rules of law.

(b) Unless both spouses are liable by other rules of law, the community property subject to a spouse's sole management, control, and disposition is not subject to:

(1) any liabilities that the other spouse incurred before marriage;

(2) any nontortious liabilities that the other spouse incurs during marriage.

(c) The community property subject to a spouse's sole or joint management, control, and disposition is subject to the liabilities incurred by him or her before or during marriage.

(d) All the community property is subject to tortious liability of either spouse incurred during marriage.

Family Code §5.61.[1] Suffice it to say, in some circumstances, a spouse may be liable, by operation of law, for a debt contracted for by another spouse. See generally Cockerham v. Cockerham, 527 S.W.2d 162, 171 (Tex. 1985) (debts contracted during marriage are presumed to be the credit of the community and thus are joint community obligations, unless it is shown that the creditor agreed to look solely to the separate estate of the contracting spouse for satisfaction); Anderson v. Royce, 624 S.W.2d 621, 623 (Tex. App. - Houston [14th Dist.] 1981, writ ref'd n.r.e. (debts undertaken during marriage are presumed to be community debts). See also Note, The Equal Credit Opportunity Act and Texas Community Property Laws: When May a Creditor Require a Spouse's Signature on Credit Instruments?, 24 S.Tex. L.J. 273 (1983); McKnight; Family Law: Husband and Wife, 23 S.W.L.J. 115, 129-38 (1981); DeFuniak and Vaughn, Liabilities of Spouses for Postnuptial Contractual Obligations, 13 S. Tex. L.J. 33 (1971); McKnight, Matrimonial Property, 22 S.W.L.J. 129, 143-45 (1968). Again, this is an especially complex area of the law which will require the special expertise of your office, along with careful consideration based on actual knowledge and experience of a myriad of factors, in order to formulate sound guidance for credit unions. In advance of a particular case, we cannot provide a definitive resolution of any hypothetical question.

---

1. Effective November 1, 1987, the language of section 5.61(b) will be slightly modified. See Acts 1987, 70th Leg., 2d C.S., ch. 50, §8, at 319, 325.

Question Two: May a credit union legally loan twelve percent of its assets to a member if the member's spouse (also a member) co-signs the loan?

Discussion: A co-signer obviously holds a contingent liability for the full amount of the loan. We understand that in common lending practice, if the principal debtor cannot pay, then the co-signer must. The limitation in article 2461-7.02 could easily be defeated if the arrangement you describe were held to create two wholly separate debts for the purpose of applying the ten percent loan limit.

Question Three: May the credit union legally loan six percent of its assets to partner A and six percent to partner B in "A-B Partnership" when no other indebtedness to the credit union by the partners exists?

Discussion: We are not certain, given the way that the facts in your question are posited, how the existence of the partnership is of any legal consequence, because you do not describe it as a debtor. The Texas Uniform Partnership Act, article 6132b, V.T.C.S., governs all aspects of partnership law. The act provides for no principle which would treat the separately acquired debts of partners as debts of the partnership. The partnership is a legal entity different from the partners in the partnership. See V.T.C.S. art. 6132b, official comments to sec. 1. Id. §8 and official comments thereto (definitions and a discussion of the notion of partnership property); Note, Partnership Creditors v. Creditors of the Individual Partners, 24 Baylor L. Rev. 557 (1972).

Question Four: May the credit union loan twelve percent of its assets to "A-B Partnership" if the partnership is a member (assume both partners as members)?

Discussion: Obviously, you may determine that a loan of more than ten percent of the assets to a legal entity, such as a partnership, is forbidden by article 2461-7.02. See our discussion of the previous question.

Question Five: May a credit union legally loan twelve percent of its assets to "A-B Partnership" if partners A and B limit their liability to six percent each?

Discussion: All partners are liable jointly and severally for all debts and obligations of the partnership. V.T.C.S. art. 6132b, §15. They may not disclaim that liability. The liability of partners for partnership debts is in addition to the liability of the partnership, which may be enforced against the partnership assets. Sections 18(1)(b) and 34 of the Uniform Partnership Act give a partner the right to an indemnity or contribution from his co-partners when he

Bromberg, The Proposed Texas Uniform Partnership Act, 14 S.W.L.J. 437, 445 n. 27 (1960). Only in the case of a "limited partnership" organized according to the Texas Uniform Limited Partnership Act, article 6132a, V.T.C.S., or the Texas Revised Limited Partnership Act, article 6132a-1, V.T.C.S., may a "limited partner" be laden with less than joint and several liability for all of the debts of the partnership. V.T.C.S. art. 6132a, §§8, 23; art. 6132a-1, §3.03. A "limited partnership" consists of both general partners who conduct the business and are personally liable to creditors as in an ordinary partnership and limited partners who do not participate in management and whose liability generally is limited to the amount of their contributions. See generally Texas Uniform Limited Partnership Act, V.T.C.S. art. 6132a, §8; Texas Revised Limited Partnership Act, V.T.C.S. art. 6132a-1, §3.03.

Question Six: May a credit union loan twelve percent of its assets to "A-B Partnership" if partners A and B each agree to full liability, jointly and severally?

Discussion: Refer to our discussion of the question above.

Question Seven: May a credit union loan six percent of its assets to a member and six percent to a business in which the member has an interest (assume a ten percent minority interest)?

Discussion: We assume that the business mentioned in your question is a properly organized coporation, that is, an entity owned by shareholders who in the normal course of business are not liable either jointly or severally, as individuals, for the debts of the corporation. Shareholders place at risk, for the satisfaction of the corporation's creditors, only the value of their investment in the company, which is represented by the paid-in capital of the corporation, and, perhaps, a portion of its capital surplus. See generally Manning, Legal Capital (2d ed. 1981). The rule is that shareholders have only limited liability; disregarding the corporate entity to impose individual liability, either joint or several, on a shareholder for the corporation's debt is the exception, and an equitable doctrine to be invoked to protect public policy concerns, and not merely the interest of creditors. Roylex, Inc. v. Langson Brothers Construction Co., Inc., 585 S.W.2d 768, 771 (Tex. Civ. App. - Houston [1st Dist.] 1979, writ ref'd n.r.e.); Pacific American Gasoline Co. v. Miller, 76 S.W.2d 833, 851 (Tex. Civ. App. - Amarillo 1934, writ ref'd).

> Among the reasons justifying the application of this doctrine is frustration of a statute's purpose. Particularly with regulatory statutes, whenever the use of a corporation circumvents the statutory purposes, it is proper to disregard the

> statutory purposes, it is proper to disregard the
> corporate entity in enforcing the statute.
> Delaney v. Fidelity Lease Ltd., 526 S.W.2d 543,
> 546 (Tex. 1975); Sapphire Homes, Inc. v. Gilbert,
> 426 S.W.2d 278, 283 (Tex. Civ. App. - Dallas 1968,
> writ ref'd n.r.e.); Beneficial Finance Company v.
> Miskell, 424 S.W.2d 482, 484 (Tex. Civ. App. -
> Austin 1968, writ ref'd n.r.e.). . . . See
> generally Hamilton, The Corporate Entity, 49 Tex.
> L. Rev. 979, 997-98 (1971).

Attorney General Opinion MW-524 (1982).  As we also said in that opinion:

> It would be proper to disregard a corporation's
> existence if it was determined that use of the
> corporate entity resulted in circumvention of the
> purposes of the ten percent loan limit of article
> 2461-7.02.  One of the primary purposes of that
> article is to insure credit union solvency and
> viability by prohibiting a concentration of loans
> in a single entity.  Due to the inherent
> limitations on capital infusion available to
> credit unions, it is important to minimize lending
> risks by diversifying loans among borrowers.  A
> high level of concentration of loans in a single
> responsible entity could have severe financial
> consequences to a credit union should that entity
> go into default.
>
> . . . .
>
> Many factors are relevant to a decision to
> aggregate such corporate loans under article
> 2461-7.02, including the degree of control by the
> member, the capitalization and current financial
> position of the corporation, the use of the loan
> money, the collateral for the loan, and guarantors
> or co-signers of the loan.  In light of these and
> other relevant factors, if the commissioner
> determines that the use of the corporate entity
> would frustrate the statutory purpose he would
> have authority to aggregate the corporate loans
> with those of the controlling member in enforcing
> the ten percent loan limit.  See generally
> Hamilton, [supra].

Id.  We are unaware of cases where the corporate entity has been disregarded merely because of the debts owed by the holder of a

of each case, based on the policy of the statute, before deciding to aggregate legally disparate entities and we cannot foreclose decisions you may reach as a part of your statutory duty.

Question Eight:  May a credit union loan six percent of its assets to a member and six percent to a business in which the member has a majority interest?

Discussion:  Refer to our discussion of the question above.

Question Nine:  May a credit union loan six percent of its assets to a member and six percent to a business in which the member's spouse has a majority controlling interest (assume no ownership by the first member)?

Discussion:  Refer to our discussion of questions one and seven, above.  The precise resolution of this question depends on several variables, not the least of which are the marital property laws.  See, e.g., Family Code §5.61, (set out in the discussion of question one above); see also id. §5.62.  Because there are so many factual variables which control the outcome to this question, it is impossible to discuss all possible outcomes in the abstract.

### S U M M A R Y

The credit union commissioner has the authority to determine whether the ten percent loan limit of article 2461-7.02, V.T.C.S., has been violated.

Very truly yours,

J I M   M A T T O X
Attorney General of Texas

MARY KELLER
Executive Assistant Attorney General

JUDGE ZOLLIE STEAKLEY
Special Assistant Attorney General

RICK GILPIN
Chairman, Opinion Committee

Prepared by Don Bustion
Assistant Attorney General