**VICTORIA BANK & TRUST COMPANY, Petitioner,**

v.

**Marlyn R. BRADY, Fancher Cattle Co., Inc. and Bill Fancher, Respondents.**

No. C–9328.

Supreme Court of Texas.

June 19, 1991.

Jess H. Hall, James W. Paulsen, Houston, John D. Murphree, Victoria, Andy Taylor, Houston, for petitioner.

Dan Fontaine, David Grant Kaiser, Randy D. Little, W. James Kronzer, Houston, for respondents.

## OPINION

HIGHTOWER, Justice.

This is a lender liability case. Victoria Bank & Trust Company (Bank) sued Marlyn and Pauline Brady, Bill Fancher (Fancher) and Fancher Cattle Company, Inc. (Cattle Company) on a promissory note. Fancher and the Cattle Company counterclaimed asserting (1) usury, (2)

fraud, duress and tortious interference with business relations, (3) breach of duty of good faith and fair dealing and (4) violations of the Texas Deceptive Trade Practices–Consumer Protection Act (DTPA). After a jury trial, judgment was rendered for Fancher and the Cattle Company against the Bank. The court of appeals affirmed in part and reversed and rendered in part. 779 S.W.2d 893. We affirm in part and reverse and render in part.

Fancher, a cattle trader and owner of the Cattle Company, had a business relationship with the Bank dating back to 1973 that usually involved loans for cattle purchases. In 1983, Marlyn Brady (Brady) formed a partnership with the Cattle Company to buy and sell cattle. The Bank agreed to supply the necessary funding for the venture. Among other things, the Bank required Brady and the Cattle Company to reduce their partnership agreement to writing and to secure the loan with Brady's ranch in Zavala County (Brady's ranch) as collateral. The Bank also insisted upon a priority lien position for this property by requiring that a pre-existing lien held by Winter Garden Production Credit Association (Winter Garden) be paid.

On November 21, 1983, Brady and Fancher, as president of the Cattle Company, executed several documents including a promissory note to the Bank (the Brady–Cattle Company note). In addition, Fancher, as president of the Cattle Company, executed a security agreement in connection with the Brady–Cattle Company note. The security agreement created a security interest or lien in the Cattle Company's cattle. Brady individually and the Cattle Company were co-makers on the note. In exchange for the note, Brady and the Cattle Company received a revolving line of credit for $150,000.00. On December 2, 1983, the Bank transferred funds to Winter Garden, purchased an assignment of Brady's note and deed of trust and achieved the required priority lien position. The

amount of the Winter Garden debt of $121,-796.75 was charged to the $150,000.00 line of credit. Consequently, Fancher [1] and the Cattle Company became obligated on Brady's pre-existing debt. However, Fancher and the Cattle Company dispute that they are responsible for Brady's pre-existing debt; Fancher testified that the Bank assured him on several occasions (1) that he would not be held responsible for Brady's pre-existing debt and (2) that Brady's ranch would be more than adequate to secure the loan.

In 1984, the Bank agreed to renew and extend the Brady–Cattle Company note and increase the amount of the line of credit for Brady and the Cattle Company. As part of the transaction, the balance of the November 1983 note (including the amount attributable to Brady's pre-existing debt) was to be paid with the proceeds of the renewal note. On June 20, 1984, Brady and the Cattle Company executed the renewal note as co-makers. Subsequently Brady and the Cattle Company traded cattle and made payments against the debt with proceeds of the transactions. Although the note was not in default, in April 1985, the Bank notified Brady and the Cattle Company that the note would not be renewed and recommended that they either seek financing elsewhere or liquidate their assets to pay the note when it became due in June 1985. The Cattle Company and Brady began to liquidate their inventory; however, in July 1985, the renewal note was declared to be in default and the Bank posted Brady's ranch for foreclosure. When it determined the probable insufficiency of Brady's ranch to cover the remaining debt on the Brady–Cattle Company renewal note, the Bank decided to pursue the Cattle Company and Fancher as guarantor for the debt.

In September 1984, the Cattle Company received a separate line of credit from the Bank. In connection with this separate line of credit, the Cattle Company pledged a certificate of deposit and executed a securi-

---

1. Although he did not sign the promissory note, Fancher signed a guaranty agreement guaranteeing the indebtedness of Brady and the Cattle Company to the Bank.

ty agreement dated September 21, 1984, which was filed and created a security interest or lien in the Cattle Company's cattle. In August 1985, after Fancher and the Cattle Company became disenchanted with the Bank, the Cattle Company paid the debt incurred in September 1984 under its separate line of credit and the Bank released a certificate of deposit which it held to secure the separate line of credit debt. However, the Bank retained the security agreement executed in connection with the Cattle Company's separate line of credit and failed to release the security interest or lien in the Cattle Company's cattle. In addition, Fancher and the Cattle Company closed their personal and corporate checking accounts at the Bank and began doing business with another local bank.

In early September 1985, Bill Richardson, a local customer, purchased cattle from the Cattle Company and paid with a draft for $82,900.00 drawn on the Bank. When Fancher presented the draft for payment, he was informed that the Bank would need authorization from Richardson before the draft could be paid[2] and that Fancher should deposit the draft in his account at his new bank. After contacting Richardson and conferring with its attorney, the Bank denied payment on the draft until Fancher agreed to deduct $40,000.00 from the draft proceeds and apply it to the remaining debt under the Brady–Cattle Company note. The Bank claimed a security interest or lien in the cattle under the September 21, 1984 security agreement re-

tained after the Cattle Company paid off its separate line of credit. The security agreement contained an after-acquired property clause which purportedly gave the Bank a security interest or lien in the cattle which were sold to Bill Richardson. Under protest, Fancher agreed to "deduct" the $40,000.00 from the draft and the $40,-000.00 was applied to the debt remaining on the Brady–Cattle Company note. After receiving the $40,000.00, the Bank surrendered the September 21, 1984 security agreement to Fancher and the Cattle Company and released the security interest or lien on the cattle.

On September 30, 1985, Brady filed suit in Zavala County against the Bank to enjoin the foreclosure of his ranch. At the temporary injunction hearing, Brady, Fancher, the Cattle Company and the Bank reached a "settlement agreement" which provided, among other things, that Fancher and the Cattle Company release the Bank from any and all claims or causes of action attributable to the "above described loan transaction."[3] Shortly thereafter when Brady and the Cattle Company defaulted on the renewal note, the Bank foreclosed on Brady's ranch and purchased it for $70,-000.00 at the foreclosure sale. Subsequently, the Bank sued Brady, the Cattle Company, Fancher and Pauline Brady[4] for the deficiency on the renewal note. Fancher and the Cattle Company counterclaimed asserting (1) usury, (2) fraud, duress and tortious interference with business relations, (3) breach of duty of good faith and

---

2. A loan officer stated: "I told Mr. Fancher that I could not honor the draft without Mr. Richardson's authorization and/or the money in the bank or a note from Mr. Richardson. And I had, I definitely did not have Mr. Richardson's authorization to honor the draft...."

3. The "settlement agreement" also provided that Brady dismiss his lawsuit against the Bank and pay $10,000.00 to the Bank, that Brady and the Cattle Company execute a $132,313.53 renewal note to be due and payable in six months, that the Bank not foreclose on the Brady ranch as long as Brady and the Cattle Company comply with the settlement agreement and renewal note, that the Bank cancel the foreclosure sale scheduled in November 1985, and that the Bank "refund" $20,000.00 to the Cattle Company with

such sum to be repaid to the Bank in accordance with the terms of the $132,312.53 renewal note. According to the agreement, the $132,-313.53 amount of the note was calculated by taking the $122,313.53 balance owing on the Brady–Cattle Company note as of October 22, 1985, less the $10,000.00 to be paid by Brady plus the $20,000.00 to be "refunded" to the Cattle Company.

4. Although they did not sign the original note or any of the renewal notes, Fancher and Pauline Brady signed guaranty agreements guaranteeing the indebtedness of Brady and the Cattle Company to the Bank.

fair dealing and (4) violations of the Texas Deceptive Trade Practices–Consumer Protection Act (DTPA). The jury answered all questions in favor of Fancher and the Cattle Company. After disregarding the jury findings concerning usury and breach of the duty of good faith and fair dealing, the trial court rendered judgment for Fancher and the Cattle Company and against the Bank on their remaining claims.[5] Fancher, the Cattle Company and the Bank appealed. Reinstating Fancher and the Cattle Company's usury claim and modifying the trial court's judgment to include usury penalties, the court of appeals affirmed in part and reversed and rendered in part. 779 S.W.2d 893.

## I.

The issues before this court are (1) whether the Bank's requirement that the Cattle Company assume Brady's pre-existing debt to Winter Garden as a condition of its extension of credit constituted usury, (2) whether the October 23, 1985 "settlement agreement" effectively barred all of Fancher and the Cattle Company's claims, and (3) whether the Bank established the privilege (or defense) of legal justification or excuse for its "interference" with the business relationship between the Cattle Company and Bill Richardson as a matter of law.[6]

## II.

■ The Bank argues that its requirement that the Cattle Company assume Brady's pre-existing debt to Winter Garden as a condition of its extension of credit did not constitute usury. We agree.

Before financing the Brady–Cattle Company partnership, the Bank required, among other things, Brady's ranch as collateral to secure the loan. However, since Winter Garden held a priority lien position on Brady's ranch as a result of an earlier loan, the Bank required that the Winter Garden loan be paid as a condition of making the loan to Brady and the Cattle Company. On November 21, 1983, Brady and Fancher, as president of the Cattle Company, executed several documents including a promissory note to the Bank and a security agreement. Brady individually and the Cattle Company were co-makers on the note. In exchange for the note, Brady and the Cattle Company received a revolving line of credit for $150,000.00. On December 2, 1983, the Bank transferred funds to Winter Garden, purchased an assignment of Brady's note and deed of trust and achieved the required priority lien position. The amount of the Winter Garden debt was $121,796.75 which was charged to the $150,000.00 line of credit. Consequently, Fancher and the Cattle Company became obligated on Brady's pre-existing debt. Fancher and the Cattle Company assert that the $121,796.75 used to pay Brady's pre-existing debt to Winter Garden constituted usurious interest.

■ Usury is defined as "interest in excess of the amount allowed by law" and interest is defined as "the compensation allowed by law for the use or forbearance or detention of money...." TEX.REV. CIV.STAT.ANN. art. 5069–1.01(a),(d) (Vernon 1987). "Any person who contracts for, charges or receives interest which is greater than the amount authorized by this Subtitle" is subject to certain penalties. TEX. REV.CIV.STAT.ANN. art. 5069–1.06(1) (Vernon 1987) (footnote omitted). The controlling question is whether a third party's debt to a different lender constitutes "interest" when a lender requires as a condi-

---

**5.** The trial court also rendered judgment for the Bank against the Bradys. However, the Bradys did not appeal the judgment of the court of appeals and are not before this court.

**6.** As a result of the disposition of the other issues, it is not necessary to consider whether Fancher and the Cattle Company were DTPA consumers in connection with the Richardson cattle transaction or whether a "special relationship" existed between Fancher and the Cattle Company and the Bank which created a duty of good faith and fair dealing in connection with the Richardson cattle transaction. Thus, we express no opinion on these issues.

tion for making a loan that a borrower assume a third party's debt owed *to a different lender.* Relying upon *Alamo Lumber Co. v. Gold,* 661 S.W.2d 926 (Tex. 1983), the court of appeals held that the Bank charged usurious interest when it required Fancher and the Cattle Company to assume Brady's pre-existing debt to Winter Garden as a condition for making a loan.

In *Alamo Lumber Co.,* Mrs. Gold's $75,-000 note payable to First National Bank of Pleasanton was in default and Mrs. Gold's son, Stetson G. Reed, had an unpaid open account with Alamo Lumber Company (Alamo) totaling $23,552.80. After proposed by Stetson G. Reed, Alamo purchased Mrs. Gold's $75,000 note from First National Bank of Pleasanton and extended the payment date and Mrs. Gold executed a note payable to Alamo representing, among other things, her son's unpaid open account with Alamo. Mrs. Gold sued Alamo for usury based upon Alamo's requirement that she assume her son's debt to Alamo. At trial, the jury found that as a condition for Alamo's purchase of Mrs. Gold's $75,-000 note from First National Bank of Pleasanton and extending its due date, Alamo required Mrs. Gold to assume or pay the debt that her son owed Alamo. Characterizing the assumption of Stetson Reed's debt owed to Alamo as interest, we held "that a lender who requires as a condition to making a loan, that a borrower assume a third party's debt, as distinguished from a requirement that the borrower pay another one of his own debts, must include the amount of the third party's debt in the interest computation." 661 S.W.2d at 928. *Alamo Lumber Co.* involved a lender's requirement that the borrower assume a third party's debt to the same lender as a condition to making a loan.

*Alamo Lumber Co.* relied upon *Stephens v. First Bank and Trust of Richardson,* 540 S.W.2d 572, 574 (Tex.Civ. App.—Waco 1976, writ ref'd n.r.e.), and *Laid Rite, Inc. v. Texas Industries, Inc.,* 512 S.W.2d 384, 389 (Tex.Civ.App.—Fort Worth 1974, no writ). *Stephens* and *Laid Rite* recognized that when "a lender, as a condition of a loan and as a consideration for making it, requires the *borrower* to pay [or assume] the debt that *another* owes to the same lender, the amount of the pay-off [or assumed] debt is considered as interest in determining whether the loan is usurious." *Stephens v. First Bank and Trust of Richardson,* 540 S.W.2d at 574 (emphasis in original); *Laid Rite, Inc. v. Texas Industries, Inc.,* 512 S.W.2d at 389. Thus, *Alamo Lumber Co., Stephens* and *Laid Rite* are not applicable when a lender requires as a condition for making a loan that a borrower assume a third party's debt owed *to a different lender.*

The Bank's requirement that Fancher and the Cattle Company assume Brady's pre-existing debt to Winter Garden has the same legal effect as a bona fide charge or fee. In *Sapphire Homes, Inc. v. Gilbert,* 426 S.W.2d 278 (Tex.Civ.App.—Dallas 1968, writ ref'd n.r.e.), these fees and charges were described as follows:

> Lenders often require borrowers to pay expenses incurred by the lenders in connection with loans, such as title policy premiums, recording fees, costs of supplemental abstracts and attorneys' fees. When such expenses are actually incurred and they are paid in good faith to those furnishing the services, and no part of the payment is received by the lender, they are not properly classified as interest in determining whether the loan is usurious.

*Id.* at 284. "Bona fide fees paid to parties other than the lender ... are [not] characterized as interest...." *Perry v. Stewart Title Co.,* 756 F.2d 1197, 1207 (5th Cir.), *opinion on rehearing,* 761 F.2d 237 (1985) (fees collected by the lender and placed in escrow for the payment of taxes and insurance premiums). *See Imperial Corporation of America v. Frenchman's Creek Corp.,* 453 F.2d 1338, 1343 (5th Cir.1972) ("Bond [*sic*] fide fees for services of this nature [fees for legal services and inspection of premises], paid to the lender's spe-

cial agents and not participated in by the lender, are not considered as interest."); *Moss v. Metropolitan National Bank of Houston*, 533 S.W.2d 397, 399 (Tex.Civ. App.—Houston [1st Dist.] 1976, no writ) (When "the lender does not receive the service charge paid for third parties to make a compensating balance deposit, such charge does not constitute interest."); *Sapphire Homes, Inc. v. Gilbert*, 426 S.W.2d. at 284 (fees for legal services).

■ The Bank had no legal or established connection with Winter Garden. *See Crow v. Home Savings Association of Dallas County*, 522 S.W.2d 457, 459–60 (Tex.1975); *Perry v. Stewart Title Co.*, 756 F.2d at 1207. The Bank did not "receive" the $121,796.75 used to pay Brady's pre-existing debt to Winter Garden.[7] *See Sapphire Homes, Inc. v. Gilbert*, 426 S.W.2d. at 284; *Perry v. Stewart Title Co.*, 756 F.2d at 1207; *Moss v. Metropolitan National Bank of Houston*, 533 S.W.2d at 399. *See generally Imperial Corporation of America v. Frenchman's Creek Corp.*, 453 F.2d at 1343. Furthermore, expenses incurred by the Bank to protect its security or collateral do not necessarily constitute interest. *See Texas Commerce Bank–Arlington v. Goldring*, 665 S.W.2d 103, 105 (Tex.1984) (Spears, J., concurring).

The Bank's requirement that Fancher and the Cattle Company assume Brady's pre-existing debt to Winter Garden is particularly analogous to *Perry v. Stewart Title Co.* In *Perry v. Stewart Title Co.*, the lender collected fees from the borrower and placed them in escrow for the payment of taxes and insurance premiums. The lender had no connection with the escrow account and the escrow funds were paid directly to the taxing authority and the insurance company. The lender did not receive any benefit from any alleged overpayments into the escrow account. Fees

for the payment of taxes and insurance premiums were collected by the lender and placed in escrow to guarantee payment of the taxes and insurance premiums and protect its lien on the property. In this case, since Winter Garden held a priority lien position on Brady's ranch as a result of an earlier loan, the Bank required Fancher and the Cattle Company to assume Brady's pre-existing debt to Winter Garden as a condition for making the loan. The Bank had no connection with Winter Garden and did not "receive" the $121,796.75 used to pay Brady's pre-existing debt to Winter Garden. The Bank required Fancher and the Cattle Company to assume Brady's pre-existing debt to Winter Garden so that it would have a superior lien on the collateral (Brady's ranch) used to secure the loan. Under these circumstances, we find that Brady's pre-existing debt to Winter Garden did not constitute "interest." Accordingly, we hold that the Bank's requirement that Fancher and the Cattle Company assume Brady's pre-existing debt to Winter Garden as a condition for making the loan did not constitute usury.

### III.

■ The Bank argues that the October 23, 1985 "settlement agreement" effectively barred all of Fancher and the Cattle Company's claims and causes of action. We disagree.

After Brady filed suit in Zavala County against the Bank to enjoin the foreclosure of Brady's ranch, Brady, Fancher, the Cattle Company and the Bank reached a "settlement agreement." Among other things, the "settlement agreement" provided that Fancher and the Cattle Company release the Bank from any and all claims or causes of action attributable to the "above described loan transaction."[8] Since we have determined that the Bank's requirement

---

7. Interest is defined as "the *compensation* ... for the use or forbearance or detention of money...." TEX.REV.CIV.STAT.ANN. art. 5069–1.01(a), (d) (Vernon 1987) (emphasis added). Implicit in the concept of "compensation" is

actual or anticipated receipt of a benefit or payment.

8. More specifically, the agreement provided in pertinent part:

that Fancher and the Cattle Company assume Brady's pre-existing debt to Winter Garden as a condition for making the loan did not constitute usury, we do not consider whether the "settlement agreement" released the Bank from the usury claim. Consequently, we must determine whether Fancher and the Cattle Company's release of the Bank "from any and all claims and causes of action ... directly or indirectly attributable to the above described loan transaction" applied to the claims and causes of action arising out of the Bill Richardson cattle transaction.

 In order to effectively release a claim in Texas, the releasing instrument must "mention" the claim to be released. Even if the claims exist when the release is executed, any claims not clearly within the subject matter of the release are not discharged. *Vela v. Pennzoil Producing Co.,*

> WHEREAS, Fancher Cattle Company, Inc. and Marlyn Brady executed a promissory note (revolving line of credit) dated June 20, 1984, in the maximum amount of Three Hundred Fifty Thousand and No/100 Dollars ($350,000.00), payable to the order of Victoria Bank & Trust Company, and secured by a Deed of Trust dated November 21, 1983 from Marlyn Brady to Robert C. Trott, as Trustee....
> WHEREAS, the maturity of the above-described note was extended ... the sums owing thereunder have not been paid and said note is now in default....
> WHEREAS, Victoria Bank & Trust Company, pursuant to the terms of the above-described Deed of Trust, had previously given notice of the exercise of its option to foreclose upon the real property....
> WHEREAS, Marlyn Brady, as Plaintiff, filed an Original Petition and Application for Injunctive Relief ... and obtained a temporary restraining order prohibiting the Substitute Trustee's Sale of said real property....
> WHEREAS, the parties hereto desire to dismiss the above-described lawsuit filed by M.R. Brady in consideration for the Bank's agreement to extend the maturity date of the above-described note and to refrain from foreclosing its lien upon the real property so long as the terms of this agreement and the documents executed in connection herewith are complied with by all parties....
> * * * * * *
> NOW, THEREFORE, in consideration of the mutual promises and agreements herein

723 S.W.2d 199, 204 (Tex.App.—San Antonio 1986, writ ref'd n.r.e.). *See Baker v. City of Fort Worth,* 146 Tex. 600, 210 S.W.2d 564, 567–68 (1948); *Houston Oilers, Inc. v. Floyd,* 518 S.W.2d 836, 838 (Tex.Civ.App.—Houston [1st Dist.] 1975, writ ref'd n.r.e.). Furthermore, general categorical release clauses are narrowly construed. *Duncan v. Cessna Aircraft Co.,* 665 S.W.2d 414, 422 (Tex.1984).

The "settlement agreement" purports to release the Bank "from any and all claims and causes of action ... directly or indirectly attributable to the above described loan transaction...." The "above described loan transaction" refers to the Brady–Cattle Company note:

> WHEREAS, Fancher Cattle Company, Inc. and Marlyn Brady executed a promissory note (revolving line of credit) dated June 20, 1984, in the maximum amount of Three Hundred Fifty Thousand and No/100 Dollars ($350,000.00),

> contained, including the recitals set forth hereinabove, the parties agree as follows:
> * * * * * *
> Upon refunding of the sum of $20,000.00 to Fancher Cattle Company, Inc., the said Fancher Cattle Company, Inc. and Bill Fancher, individually, hereby RELEASE, ACQUIT and FOREVER discharge Victoria Bank & Trust Company, its agents, servants, and employees, and all persons, natural or corporate, in privity with them or any of them, from any and all claims or causes of action of any kind whatsoever, at common law, statutory or otherwise, which Fancher Cattle Company, Inc. or Bill Fancher, Individually, have or might have, known or unknown, now existing, directly or indirectly attributable to the above described loan transaction, it being intended to release all claims of any kind which Fancher Cattle Company, Inc. and Bill Fancher, Individually, might have against Victoria Bank & Trust Company, whether heretofore asserted or not. It is expressly understood and agreed that the terms of this release are contractual and not merely recitals and that the release herein contained and the consideration transferred is to compromise doubtful and disputed claims, avoid litigation and buy peace, and that no payments made nor releases or other consideration given shall be construed as an admission of liability, all liability being expressly denied.

payable to the order of Victoria Bank & Trust Company....

Except for usury, all of Fancher and the Cattle Company's claims and causes of action arise directly out of the Bill Richardson cattle transaction. These claims and causes of action include (1) whether the Bank tortiously interfered *with the business relationship between the Cattle Company and Bill Richardson,* (2) whether the Bank failed to act fairly and in good faith with Fancher and the Cattle Company *in the Bill Richardson cattle transaction,* and (3) whether the Bank engaged in a false, misleading or deceptive act or practice *in connection with the Bill Richardson cattle transaction.* Fancher and the Cattle Company's claims and causes of action arising out of the Bill Richardson cattle transaction are not mentioned or clearly within the subject matter of the "settlement agreement." The Bill Richardson cattle transaction is not mentioned or clearly within the subject matter of the "settlement agreement." Furthermore, the Bill Richardson cattle transaction was based upon a security agreement executed by the Cattle Company in September 1984 in connection with a separate line of credit and retained by the Bank after the Cattle Company paid its separate debt. Considering the "settlement agreement" as a whole and in light of the surrounding circumstances, we conclude that Fancher and the Cattle Company's claims and causes of action arising out of the Bill Richardson cattle transaction are not mentioned or clearly within the subject matter of the "settlement agreement." Accordingly, we hold that the October 23, 1985 "settlement agreement" did not operate to release or otherwise bar Fancher and the Cattle Company's claims and causes of action arising out of the Bill Richardson cattle transaction.

## IV.

■ The Bank argues that it established the privilege (or defense) of legal justification or excuse for its "interference" with the business relationship between the Cattle Company and Bill Richardson as a matter of law. We disagree.

■ The elements of a cause of action for tortious interference are (1) the existence of a contract subject to interference, (2) the act of interference was willful and intentional, (3) such intentional act was a proximate cause of plaintiff's damage and (4) actual damage or loss occurred. *Juliette Fowler Homes v. Welch Associates,* 793 S.W.2d 660, 664 (Tex.1990). Until recently, the lack of justification or excuse was considered as an element of the plaintiff's cause of action. *Id.* at 664 n. 7. *See Sakowitz, Inc. v. Steck,* 669 S.W.2d 105, 107 (Tex.1984). However in *Sterner v. Marathon Oil Co.,* 767 S.W.2d 686 (Tex. 1989), this court partially overruled *Sakowitz* and held that "the privilege of legal justification or excuse in the interference of contractual relations is an affirmative defense upon which the defendant has the burden of proof." 767 S.W.2d at 690. Under the defense of legal justification or excuse, one is privileged to interfere with another's contractual relations (1) if it is done in a bona fide exercise of his own rights, or (2) if he has an equal or superior right in the subject matter to that of the other party. *Sterner v. Marathon Oil Co.,* 767 S.W.2d at 691; *Sakowitz, Inc. v. Steck,* 669 S.W.2d at 107. One may be "privileged" to assert a claim "even though that claim may be doubtful, so long as it asserted a colorable legal right." *Sakowitz, Inc. v. Steck,* 669 S.W.2d at 107 (*citing Hardin v. Majors,* 246 S.W. 100, 102 (Tex.Civ. App.—Amarillo 1923, no writ)). However, the defense of legal justification or excuse only protects good faith assertions of legal rights. *See Sakowitz, Inc. v. Steck,* 669 S.W.2d at 107, 109; *American Petrofina, Inc. v. PPG Industries, Inc.,* 679 S.W.2d 740, 758–59 (Tex.App.—Fort Worth 1984, writ dism'd by agr.); *Bellefonte Underwriters Ins. Co. v. Brown,* 663 S.W.2d 562, 573 (Tex.App.—Houston [14th Dist.] 1983), *aff'd in part and rev'd in part on other grounds,* 704 S.W.2d 742 (Tex.1986); *Hardin v. Majors,* 246 S.W. at 102 ("[A] party

to or interested in a contract may, by legal proceedings or otherwise in good faith, interfere with the execution of the contract where there is a bona fide doubt as to his rights under it."); Restatement (Second) of Torts § 773 (1979).

At trial, the jury found that the Bank "interfered with the business relationship between Fancher Cattle Company, Inc., and Bill Richardson." "A party attempting to overcome an adverse fact finding as a matter of law must surmount two hurdles. First, the record must be examined for evidence that supports the jury's finding, while ignoring all evidence to the contrary. Second, if there is no evidence to support the fact finder's answer, then, the entire record must be examined to see if the contrary proposition is established as a matter of law." *Sterner v. Marathon Oil Co.*, 767 S.W.2d at 690.

The Cattle Company received an extension of credit (a separate line of credit) and executed a security agreement (dated September 21, 1984). The Bank filed the security agreement which created a security interest or lien in the Cattle Company's cattle. After the Cattle Company paid the debt (its separate line of credit), the Bank released a certificate of deposit which it held to secure the debt. As a general rule, when a secured debt is paid, the Bank releases its security interest or lien in the collateral securing the note. However, the Bank retained the security agreement and failed to release the security interest or lien in the Cattle Company's cattle. When Fancher presented Bill Richardson's $82,900.00 draft for payment, he was informed that the Bank would need authorization from Richardson before the draft could be paid and that Fancher should deposit the draft in his account at his new bank. After contacting Richardson and conferring with its attorney, the Bank denied payment until Fancher agreed to deduct $40,000.00 from the draft proceeds and apply it to the disputed Brady–Cattle Company note. Although the Bank could have arguably claimed a security interest or lien in the cattle under a security agreement executed on November 21, 1983 in connection with the disputed Brady–Cattle Company note, the Bank claimed a security interest or lien in the cattle specifically under the September 21, 1984 security agreement. The September 21, 1984 security agreement contained an after-acquired property clause which purportedly gave the Bank a security interest or lien in the cattle.

Even if the Bank asserted a "colorable legal right" against the Cattle Company for the proceeds of the Bill Richardson draft, only good faith assertions of legal rights are protected. Since the Bank retained the September 21, 1984 security agreement and failed to release the security interest or lien after payment of the debt and asserted the security interest or lien in the cattle sold to Bill Richardson, we conclude that there is some evidence that the Bank did not act in good faith when it claimed a security interest or lien in the proceeds of the Bill Richardson draft. Accordingly, we hold that the Bank did not establish the privilege (or defense) of legal justification or excuse for its "interference" with the business relationship between the Cattle Company and Bill Richardson as a matter of law.

### V.

For the reasons explained herein, we reverse that portion of the court of appeals' judgment reinstating Fancher and the Cattle Company's usury claim and render judgment that Fancher and the Cattle Company take nothing on their usury claim. We affirm the remainder of the judgment of the court of appeals.

Concurring and Dissenting Opinion By Mauzy, J.

MAUZY, Justice, concurring and dissenting.

I concur in parts III and IV of the majority opinion. I dissent, however, from the Court's holding in part II, concerning Vic-

toria Bank's alleged usury. In my view, the transaction at issue here falls squarely within this Court's holding in *Alamo Lumber Co. v. Gold,* 661 S.W.2d 926 (Tex.1983).

In *Alamo Lumber Co.,* we held that "a lender who requires as a condition to making a loan, that a borrower assume a third party's debt, as distinguished from a requirement that the borrower pay another one of his own debts, must include the amount of the third party's debt in the interest computation." 661 S.W.2d at 928. Following this Court's guidance, the trial court in the present case submitted to the jury the following question:

> Do you find that Victoria Bank & Trust Co., as a condition for making the $150,000 line of credit, required Fancher Cattle Co., Inc. to assume Marlyn Brady's $121,796.75 debt?

The jury answered "Yes."

That finding alone would seem to bring this case within the clear language of *Alamo Lumber Co.* The majority, however, chooses to disregard the jury's finding. Brady's pre-existing debt, the majority explains, was to Winter Garden; thus, Victoria Bank "did not 'receive' the $121,796.75 used to pay the pre-existing debt," and that sum cannot be considered interest. 811 S.W.2d at 936–937.

Whether it "received" the $121,796.75 or not, Victoria Bank did charge exactly that amount to the new, $150,000 line of credit, for which Fancher was responsible. In return for assuming that $121,796.75 obligation, Fancher received only the remaining $29,203.25 in credit, plus the opportunity to pay the Bank $150,000 at a nominally-legal rate of interest.

This is precisely the sort of transaction which we examined in *Alamo Lumber Co.*

There, as here, a lender conditioned a loan on the borrower's assumption of a third party's debt. And there, as here, the borrower received no independent benefit from assuming that debt. On the basis of clear precedents from Texas and elsewhere, we rightly held that the Bank's requirement made the pre-existing debt interest as to the borrower who assumed it.

The majority strains to distinguish *Alamo Lumber Co.* on the ground that the pre-existing debt in this case was owed to a different lender. In fact, though, Fancher never owed a dime to that prior lender. As the court of appeals observed, Brady became indebted to Victoria Bank before the note at issue ever became effective.[1] Thus, in reality, Fancher did not assume a debt to Winter Garden; Fancher assumed a debt to Victoria Bank.

To determine the existence or non-existence of usury, a court should look beyond a transaction to its substance. *Gonzales County Savings & Loan Ass'n v. Freeman,* 534 S.W.2d 903, 906 (Tex.1976). Regardless of the label placed upon it by the lender, a charge which is in fact compensation for the use, forbearance or detention of money is, by definition, interest within the usury statute. *Id.; see* Tex.Rev.Civ. Stat.Ann. art. 5069–1.01(a). Victoria Bank's requirement that Fancher assume Brady's debt was exactly that sort of charge. I would therefore affirm the court of appeals' judgment for Fancher and the Cattle Company on their counterclaim against the Bank for usury.

---

1. This critical point was confirmed at trial during cross-examination of the Bank's own loan officer, David Barnhart:

 Q: And, in fact, Marlyn Brady's land had a lien against it to Victoria Bank & Trust and that had to be accomplished first before that line of credit went into effect; isn't that right?

 A: The Bank is saying with this document that it was not going to fund the loan until it received a first lien on the Zavala County property, that is correct.