James D. HUBBARD and Michael McGinnis, Appellants,

v.

Donald C. DALBOSCO, Appellee.

No. 01–93–00181–CV.

Court of Appeals of Texas, Houston (1st Dist.).

Nov. 17, 1994.

Rehearing Overruled Dec. 8, 1994.

Paul J. McConnell, III, Ben A. Baring, Jr., Stephen C. Reid, III, Houston, for appellants.

Joe G. Roady, Houston, for appellee.

Before ANDELL, DUGGAN and HUTSON–DUNN, JJ.

## OPINION

ANDELL, Justice.

In this case we must decide whether members of a homeowners committee, in their unofficial capacities as individual homeowners, may be held liable for tortious interference with a contract for telling a prospective builder that they would not approve plans to subdivide a lot upon which the build-

er has an option contract, where no plans were ever submitted under that contract and where the homeowners had voted to amend the deed restrictions to disallow subdividing. We hold that the committee members were legally privileged and are not liable.

The trial court rendered judgment on the verdict for $150,800 in favor of Donald C. Dalbosco, appellee, and against appellants, James D. Hubbard and Michael McGinnis,[1] for tortious interference with an option contract to which Dalbosco was not a party.[2] In six points of error, Hubbard and McGinnis challenge the legal and factual sufficiency of the evidence to support the judgment, claim that they were legally privileged to interfere with the contract, and complain of a definition in the jury charge. Because we hold that they were legally privileged to interfere, we reverse and render judgment that Dalbosco take nothing against Hubbard or McGinnis.

## I. Factual Background of the Dispute

Dalbosco, a real estate developer and oil and gas investor, was in serious financial difficulty. He had approximately $4 million "tied up" in litigation involving his oil and gas business. He borrowed $4 million from Northwest Bank to cover his cashflow during that litigation but defaulted on that note.[3] Dalbosco had other notes with Northwest Bank, but he defaulted on all of them.[4]

Dalbosco owned a lot and home (Lot 1) in the Woodland Hollow subdivision, but he did not live there.[5] Woodland Hollow was a very small subdivision, with only 22 lots, ranging in size from slightly over a half-acre to a little over an acre. Dalbosco had previously lived there but had moved away, and at the time of these events his daughter and son-in-law lived in the home on Lot 1. Dalbosco had previously owned an adjoining lot (Lot 2) that also had a home on it, but he deeded Lot 2 to Northwest Bank in lieu of foreclosure.

Dalbosco conceived a plan to help remedy some of his financial ills. He would: (1) purchase Lot 2 and tear down the home that was on it; (2) subdivide Lot 2 into two lots; and (3) sell the two newly subdivided lots to a homebuilder. Lot 2 was not a full acre, but Dalbosco could get two half-acre lots by replatting Lot 1, which he owned, and adding a portion of it to Lot 2. The result would be that Lots 1 and 2 would be replaced by three lots carved out of Lots 1 and 2.[6] Dalbosco claimed that the resulting three lots would have been over half an acre each, which was the minimum size upon which a house could be built under the deed restrictions that were in effect at that time.[7]

Dalbosco sent a letter to all the homeowners to persuade them to go along with his plans, showing them that they could do the same thing with their lots. Dalbosco suggested a re-platting of the entire subdivision, which would allow more homes to be built in between existing homes or in the place of existing homes. The neighbors were opposed to Dalbosco's proposal. Hubbard and McGinnis, along with homeowners Bob Bruce, Ben Aderholt, and Cathy Wagner, testified that they did not want to see the character of the neighborhood changed. The majority of homeowners voted to amend the

---

1. Actual damages of $90,800 were assessed against Hubbard and McGinnis, jointly and severally; punitive damages of $60,000 were assessed against Hubbard only.

2. Although Dalbosco did not sign the contract, he appears to have been an undisclosed principal for whom Milton Geiselman signed as "trustee." Appellants are not challenging Dalbosco's right to recover in this capacity.

3. Dalbosco was at least $2,200,000 in debt and was in danger of foreclosure before this dispute with Hubbard and McGinnis over Lot 2. He had already defaulted on a $4 million note to Northwest Bank.

4. Dalbosco had previously been a director of Northwest Bank.

5. By the time of trial, the bank had foreclosed on his homestead and he had moved back into the home he owned in Woodland Hollow (on Lot 1).

6. Lot 2 is the focus of this dispute.

7. The relevant covenant provision reads, in pertinent part: "Only one single-family residence, and its usual accessories, shall be constructed or permitted on each lot; however, this shall not prohibit the construction of a residence on a portion of one or more lots as shown by said Plat, provided such tract shall have an area of not less than one-half acre."

deed restrictions to prohibit the subdividing of lots, and elected Hubbard, McGinnis and Aderholt to a committee to prepare the new deed restrictions.[8] Yet in the face of this opposition, Dalbosco pursued his plan to subdivide Lot 2.

At least five contracts were involved in the relationships that led to this lawsuit, and Dalbosco brought several claims against Hubbard and McGinnis. Most of Dalbosco's claims were eliminated by summary judgments or negative jury findings, and he recovered on only one cause of action. The jury found that Hubbard and McGinnis tortiously interfered with one of the several contracts discussed at trial. The other contracts are not a part of this appeal, but are included for context.

### First Contract

Dalbosco apparently could not afford to purchase Lot 2 outright, so he put down earnest money on an option to repurchase it from Northwest Bank, to which he had deeded Lot 2 in lieu of foreclosure. Dalbosco never exercised this option to purchase, and it expired after the events that provide the basis for this suit. Dalbosco never owned Lot 2 during the time period relevant to this dispute.

### Second Contract

Dalbosco had a prospective purchaser for Lot 2. The Woodland Hollow deed restrictions were about to expire, and the prospective purchaser, First Crest Corp., told Dalbosco that it did not want to buy Lot 2 unless the deed restrictions were extended for another 10–year period. The deed restrictions in force at the time of Dalbosco's plan required a minimum lot size of one-half acre. The deed restrictions would automatically renew unless the homeowners took action.

8. Although Aderholt was a member of the homeowners committee, he was not named in this suit.

9. Although Dalbosco sued Hubbard and McGinnis for tortiously interfering with the First Crest contract at the July meeting, he testified that it was Bob Bruce, not Hubbard or McGinnis, who told people at the July meeting to stop signing the extension agreement that he was promoting.

It had been several years since the homeowners had met as an association, and they did not have an active committee. Dalbosco called a homeowners meeting on July 12, 1989, held at his daughter's home on Lot 1. His purpose for this meeting was to obtain homeowners' signatures on an agreement that he had prepared that would extend the deed restrictions as then written. Dalbosco testified that First Crest required this extension before it would follow through with its contract to purchase Lot 2.

*The majority of the homeowners at the July meeting were opposed to allowing the deed restrictions to extend as then written, and voted to amend the covenant to prohibit building on half-acre lots.* When those present at the meeting generally refused to go along with his plans, he tore up the prepared extension agreement in front of everyone there. Dalbosco could not obtain the signatures he needed to meet the conditions of the First Crest contract, and First Crest chose not to purchase Lot 2.

Dalbosco claimed that Hubbard and McGinnis were acting in derogation of their authority at the July meeting by telling homeowners not to sign his extension agreement.[9] Hubbard and McGinnis, however, had no more authority at the July meeting than anyone else there. Hubbard and McGinnis did not become members of the owners committee until that meeting, and Dalbosco was instrumental in getting both Hubbard and McGinnis on the committee.[10] Furthermore, Dalbosco testified that even before the July meeting, he knew that Hubbard and McGinnis had been opposed to the idea of building on half-acre lots. The trial court granted summary judgment in favor of Hubbard and McGinnis on this claim, which Dalbosco has not appealed.

10. Dalbosco stated that he thought McGinnis was someone he could "reason with" regarding his plan to subdivide Lot 2. This was in spite of the fact that both Hubbard and McGinnis voted against Dalbosco's plan at that meeting, before they were elected to the committee.

## Third Contract

After First Crest decided not to buy Lot 2, Dalbosco granted an option on Lot 2 to real estate developer Milt Geiselman. An additional agreement made Geiselman either a trustee or an agent for Dalbosco. Geiselman never exercised his option to purchase Lot 2, and he never sold Lot 2 as a trustee or an agent for Dalbosco. Dalbosco did not allege interference with this contractual relationship.

## Fourth Contract: Jury Found Tortious Interference

In November 1989, Geiselman granted an option on Lot 2 to the Forrester Corp., through its president Mike Kindred, who was a homebuilder. This was four months after the homeowners had voted to amend the deed restrictions and had elected Hubbard, McGinnis and Aderholt to accomplish this task, and two months after Hubbard and McGinnis had circulated the first draft of the amended covenant.

The Geiselman–Kindred contract contained a "free look" provision that would allow Kindred to walk away from his option to purchase Lot 2 without losing his earnest money. Dalbosco knew from the July meeting that the homeowners were opposed to building on subdivided lots in Woodland Hollow, but he never told this to Kindred. Kindred talked with some of the homeowners, including Hubbard and McGinnis, and learned of this opposition. Kindred then terminated this contract without submitting any plans to the homeowners committee, and he recovered his earnest money. Dalbosco claimed that Hubbard and McGinnis tortiously interfered with this contract, and the jury agreed. This finding is the only basis for this appeal.

## Fifth Contract

After the Kindred contract had become history, Geiselman granted another option on Lot 2 to the Eaton Group and its president,

George Ragsdale. Geiselman then went back to Kindred, who was not involved in the Eaton Group contract, and he requested some house plans. Geiselman took the house plans that he borrowed from Kindred and submitted them to Hubbard and McGinnis under the Eaton Group option contract, and Hubbard and McGinnis rejected those plans. Dalbosco also claimed that Hubbard and McGinnis tortiously interfered with this contract by rejecting the house plans, but the jury found to the contrary.

## The Plans That Were Never Submitted

Dalbosco bases his claim largely on Hubbard's and McGinnis's rejection of his plans for building houses on the two half-acre lots that would have resulted from his plan for Lot 2. However, *no one—Dalbosco, Geiselman, or Kindred—ever submitted any plans to Hubbard or McGinnis relating to the Kindred contract.* Kindred testified that he would not have built houses on Lot 2 from the plans that Geiselman had later borrowed from him. And Geiselman himself testified that he knew of no one who was planning to build those houses from those plans. Hubbard and McGinnis, therefore, never had an opportunity to disapprove any plans relating to the Kindred contract.[11]

## The Builder Chose Not to Exercise His Option on Lot 2

Kindred's testimony provides the only evidence of his reason for choosing not to exercise his option on Lot 2.[12] This is the only basis upon which the jury could have found tortious interference with the Geiselman–Kindred contract.

Kindred looked over the deed restrictions (but not the new suggestions for the amended version) and determined that the restrictions probably would not prohibit his plan to subdivide Lot 2 and build two homes on the resulting half-acre lots. He entered the earnest money option contract with Geiselman

---

11. Dalbosco bases his appellate brief extensively on these plans. However, all the evidence at trial pertaining to the submission and rejection of plans is irrelevant to this appeal, and Dalbosco's appellate arguments are misplaced.

12. Any testimony from Dalbosco regarding Kindred's reason for not exercising his option would be inadmissible hearsay, because Dalbosco was not a party to the contract. Geiselman, who was a party to this contract, did not testify on this question.

based on this understanding that the subdivision probably would be allowed, but he required a "free look" provision so he could decide whether he wanted to build there. This would give him time to talk with the neighbors and back out of the contract if he found opposition.[13] Kindred testified that *even if he had been within his legal rights to subdivide and build, he would not want to build where the neighbors would be antagonistic toward him.* He further testified that he would go out of his way to avoid trouble with the neighbors whenever he could.

It was within this context that Kindred's testimony provided the only evidence of interference with the contract. Kindred testified that he drove down the street and knocked on the door of a homeowner, Cathy Wagner, and told her of his plan to subdivide and build on Lot 2. She told him that the subdivision would be opposed to it, and she gave him the phone numbers of Hubbard, McGinnis and Aderholt. Kindred testified that when he told Hubbard of his plan, Hubbard replied that they would not allow for the subdividing, and that if he proceeded he would be "buying a lawsuit."

Kindred then used his "free look" provision to get out of the contract, and chose not to exercise his option to purchase and subdivide Lot 2, even though he believed that the deed restrictions would have allowed the plan. The alleged statements from Hubbard and McGinnis are the only possible bases for the finding of tortious interference.[14]

## II. Causes of Action and Judgment Below

At trial, Dalbosco alleged four causes of action against Hubbard and McGinnis: (1)

13. Kindred testified that he often built in established neighborhoods and did not like to get the neighbors upset with him. Kindred said if a neighborhood is unhappy with him for building there, "It's not a good situation and I don't want to do it."

14. Kindred repeatedly testified that he was unsure of who told him what, but that it was probably Hubbard or McGinnis.

15. This was approximately the amount of one of the notes to Northwest Bank on which Dalbosco had defaulted. A few months before Dalbosco

tortious interference with the First Crest contract; (2) tortious interference with the Kindred–Forrester Corp. contract; (3) tortious interference with business relationships with (a) Kindred–Forrester Corp. and (b) Eaton Group–Ragsdale; and (4) conspiracy to tortiously interfere with all of the above. Dalbosco sought $4,500,000 from Hubbard and McGinnis under this aggregate of claims.[15] The trial court granted partial summary judgment against Dalbosco, disposing of his claim that Hubbard and McGinnis had tortiously interfered with the First Crest contract. The jury found that Hubbard and McGinnis had not tortiously interfered with business relationships with Kindred or with the Eaton Group, nor conspired to do any of the above.

As noted above, the only claim upon which Dalbosco recovered was his allegation that Hubbard and McGinnis had tortiously interfered with the option contract between Geiselman and Kindred. Of the four causes of action that Dalbosco pleaded, this is the only one involved in this appeal.[16] Therefore, the only evidence that is relevant to this appeal is that which addresses the Geiselman–Kindred option contract and the reason that Kindred chose not to exercise his option.[17]

## III. Analysis

To recover on a claim for tortious interference with contract, a plaintiff must prove the following elements: (1) the existence of a contract subject to interference, (2) a willful and intentional act of interference, (3) such act was a proximate cause of damage, and (4) actual damage or loss occurred. *Browning–Ferris, Inc. v. Reyna,* 865 S.W.2d 925, 926 (Tex.1993).

commenced this plan to subdivide Lot 2, Northwest Bank had been "pressuring" him about this old debt.

16. Dalbosco's appellate brief repeatedly argues about evidence that addresses only his failed causes of action, which are not on appeal.

17. In support of the malice finding against Hubbard, Dalbosco directs this court only to evidence that is not connected to this contract. Because we dispose of this case on the grounds of legal privilege to interfere, we need not address the question of malice.

■ In their first and second points of error, Hubbard and McGinnis challenge the legal and factual sufficiency of the evidence to support the submission of particular jury questions. However, we need not address these two points of error, because we find their third point of error to be dispositive. In point of error three, Hubbard and McGinnis claimed they could not be held liable for tortious interference with the Kindred contract because they were legally privileged to interfere.

■ Hubbard and McGinnis pleaded the affirmative defense of justification, excuse or privilege to interfere. *Sterner v. Marathon Oil Co.*, 767 S.W.2d 686, 690 (Tex.1989).[18] A party is privileged to interfere with another's contract when either of the following is true: (1) the interference is done in a bona fide exercise of the interfering party's rights, or (2) the interfering party has an equal or superior interest in the subject matter to that of the other party. *Id.* at 691. The defense of legal justification exists only to protect good faith assertions of legal rights. *Victoria Bank & Trust v. Brady*, 811 S.W.2d 931, 939 (Tex.1991). Even a doubtful claim of a legal right can justify interference with a contract, as long as it asserted a "colorable legal right." *Id.* Hubbard and McGinnis claim that they were privileged to tell Kindred that they were opposed to any plans to build on subdivided lots in Woodland Hollow. We agree for the reasons discussed below.

### The Homeowners Elected Hubbard and McGinnis to Amend the Deed Restrictions

The homeowners had voted to tighten the deed restrictions, which otherwise would have expired at the end of 1989 and then would have automatically renewed for another 10 years. Dalbosco himself testified that the homeowners decided to change the deed restrictions when they met in July 1989:

> They voted to change the deed restrictions at the meeting and they appointed the

committee to get some new deed restrictions drawn up that would not allow homes to be built on one-half acre tracts but they could build only on the lots as they were platted in that subdivision.

Hubbard, McGinnis and Aderholt were elected at the July 1989 meeting for the specific purpose of drawing up new deed restrictions that would not allow homes to be built on half-acre lots. They prepared a draft of new deed restrictions and circulated it at a meeting in September 1989. This amended version was inadequate, and the committee continued its work.

We recognize that, as a practical matter, it can take many months to get homeowners to agree on the specific wording of a new document of this magnitude. It took nearly two years in the present case (from the meeting in July 1989 until the filing in April 1991). The facts of this case show that the homeowners had already decided to tighten their deed restrictions at the July 1989 meeting. The committee began the process of revising the deed restrictions to prohibit building on half-acre lots. Hubbard and McGinnis, as members of the homeowners committee, had the privilege of telling Kindred that they would not allow the subdividing of Lot 2 into two half-acre lots. Indeed, this was what they were elected to do.

### Unofficial Capacities as Individuals

The covenant explicitly granted members of the committee the discretionary authority to approve or disapprove any plans that Kindred might have submitted. But Kindred never submitted any plans, and Hubbard and McGinnis were not presented with the opportunity to act in their official capacities.

Dalbosco sued Hubbard and McGinnis, not as members of the homeowners committee, but as individuals. He argues that Hubbard and McGinnis were acting as individuals. In

18. In *Sterner*, the Supreme Court held that justification, excuse or privilege to interfere was no longer an element of the cause of action, but was an affirmative defense. This holding overruled *Sakowitz v. Steck*, 669 S.W.2d 105 (Tex.1984), under which the plaintiff had the burden to show that the defendant's interference was without justification, excuse, or privilege, as an element of the cause of action. *Sterner* shifted the burden on this issue to the defendants. 767 S.W.2d at 690.

his appellate brief, Dalbosco characterizes this case in the following way:

> This case was about two *individuals* who did something they had no right, power or authority to do, and in so doing tortiously interfered with a contract. It is about deed restrictions which specifically authorized tract sizes in the Woodland Hollow Subdivision of not less than one-half acre and an interference with a contract based upon the Appellants' *personal* point of view that they, *as individual lot owners* in the subdivision, did not want Mr. Dalbosco to subdivide two contiguous lots into three tracts, even though after the replatting, each of the three tracts would have been contained more than one-half acre.
>
> This case is *not* about the authorized or discretionary act of a subdivision owners or architectural control committee; it is about the unauthorized act of two *individuals* who imposed their *personal points of view* on their neighbor *in violation of the specific authority of the applicable deed restrictions.*

(Emphasis added.)

Dalbosco claims that he did not sue Hubbard and McGinnis in their capacity as members of the owners committee.[19] Yet he claims that it was their denial of his submitted plans that formed the basis of his tortious interference claim. Dalbosco never submitted any plans to Hubbard or McGinnis under the Kindred (Forrester) contract.

Out of the entire five-day trial, the only possible evidence of tortious interference with the Kindred–Forrester contract is in the remarks that Hubbard and McGinnis allegedly made to Kindred. Yet Dalbosco insists that any statements that Hubbard or McGinnis made to Kindred were in their capacity "as individual lot owners" and represented their "personal point[s] of view" that they did not want to see Lot 2 subdivided. Dalbosco then claims that an individual homeowners' statement of personal preference amounts to a tortious interference with a contract. Since he insists that Hubbard and McGinnis were not acting as officials, he failed to show

that anything they did or said was outside their prerogative as individual homeowners.

In determining whether Hubbard and McGinnis were privileged, we note that Dalbosco admits that Hubbard and McGinnis were simply expressing their own personal preferences to Kindred. In addition, Hubbard and McGinnis never took any official action on any plans under the Kindred contract, because none were ever submitted. Dalbosco asserts that liability should attach to a member of a homeowners committee for such statements of personal preference, even though that person has taken no official action, and has not even been given the opportunity to take official action. We disagree. If these words were words of individuals stating personal preferences, as Dalbosco asserts in his appellate brief, then these words were justified as a matter of law, and could not have constituted tortious interference with the Geiselman–Kindred option contract. Deed restrictions cannot prevent individual homeowners from stating their personal points of view about their neighborhood.

## IV. Conclusion

Hubbard and McGinnis, as members of the homeowners committee, were correct in telling Kindred that they would not allow for building on subdivided lots, because that is what the majority of homeowners had already decided at the July meeting. Hubbard and McGinnis, along with Aderholt, were charged with the responsibility of preparing new deed restrictions to reflect the wishes of the majority of homeowners. Hence, they were within their privilege as committee members to inform Kindred of the homeowners' decision not to allow for building on subdivided lots. Hubbard and McGinnis cannot be held personally liable where they could not be held liable in their official capacities. Dalbosco has failed to show a basis for liability under these facts.

We sustain point of error three. Because this point is dispositive, we need not address the remaining points of error.

---

**19.** Dalbosco's live trial pleading identified each of the defendants as individuals and said nothing of their capacity as members of the homeowners committee.

We reverse and render judgment that Dalbosco take nothing in this cause.