SARATOGA RESOURCES,
INC., Appellant,

v.

Pat BAKER d/b/a Baker Exploration
Company and Bexco Operating,
Inc., Appellees.

No. 01–00–00149–CV.

Court of Appeals of Texas,
Houston (1st Dist.).

Oct. 25, 2001.

Robert L. Ketchand, Houston, for Appellant.

Talmage Boston, Winstead Sechrest &
Minick, Dallas, for Appellee.

Panel consists of Justices TAFT, BRISTER,[1] and DUGGAN.[2]

## OPINION

LEE DUGGAN, JR., Justice (Assigned).

In this appeal, appellant Saratoga Resources, Inc. ("Saratoga") contends the trial court erred by granting a motion for summary judgment in favor of appellees, Pat Baker d/b/a Baker Exploration Company and Bexco Operating, Inc. ("Baker"), and denying appellant's own motion for summary judgment. The issue before us on appeal is whether Saratoga is entitled to recover a refund of certain expenses it paid pursuant to an oil and gas operating agreement. We affirm.

## BACKGROUND

### 1. The Operating Agreement Between Saratoga and Baker

On July 25, 1994, Saratoga entered into an agreement with Baker, which (1) conveyed Saratoga's interest in certain oil and gas interests, as well as a gas gathering line and salt water disposal system, and, in return, (2) Baker became the operator for all drilling and production efforts in the property. In connection with the conveyance, Baker and Saratoga executed an "Operating Agreement", which provided in relevant part:

> Baker shall take over operations of the gas gathering system and salt water disposal well.... Normal operating expenses of the salt water disposal well and the gas gathering line shall be borne 75% by Baker and 25% by Saratoga until other arrangements may be agreed to.

Shortly after this agreement was entered into, Baker expanded the system and hooked on wells that received the benefit of the system, but in which Saratoga had no interest. Thus, Saratoga believed that it was paying a disportionate amount of the costs associated with the salt water disposal system and gas gathering system.

Saratoga objected to the situation and requested an audit and adjustment, but Baker refused any adjustment or audit until Saratoga came current on its debts to Baker.

### 2. Saratoga Sells Out to Prime Energy

In May 1996 (but effective as of January 1, 1996), Saratoga conveyed all of its interest in the properties to Prime Energy Corporation ("Prime"). The agreement between Saratoga and Prime conveyed, among other things:

> all accounts receivable, security deposits, prepayments, refunds, right to refunds, and rebates in favor of, owing to, or possessed or controlled by the Saratoga Companies....

The agreement provided that Saratoga retained "[a]ll revenues, proceeds, receipts, and income ("Revenues") attributable to production from the Wells and the sale of the properties prior to [January 1, 1996] ..."

### 3. The Post–Conveyance Audit

In late 1996, after the sale to Prime, Saratoga had Buck Services, Inc. conduct an audit, pursuant to the audit provisions of the Operating Agreement. Mr. Buck, of Buck Services, Inc., concluded that Saratoga should have paid 8% of the operating

---

1. Justice Scott Brister, who became Chief Justice of the Fourteenth Court of Appeals on July 16, 2001, continues to sit by assignment for the disposition of this case, which was submitted on March 12, 2001.

2. The Honorable Lee Duggan, Jr., retired Justice, Court of Appeals, First District of Texas at Houston, participating by assignment.

costs, rather than the 25% it had actually paid, and so informed Baker by letter dated June 25, 1997, that Saratoga was entitled to a refund in the amount of $100,359.82. Baker did not respond to the "Buck exceptions" letter within 180 days, as required by the terms of the Operating Agreement. Instead, Baker responded on the 190th day and denied Saratoga's claim.

### 4. The Normalization Agreement

In July 1996, after Saratoga's sale to Prime, the working interest owners, including Prime, entered a "Normalization Agreement." Under this agreement, Prime's ownership interest in the facilities, thus, its share of the expenses, was reduced from 25% to 8%. The Normalization Agreement specifically stated that the adjustments made to Prime's working interest and expense responsibility were prospective only. Saratoga was not a party to the Normalization Agreement, because it had already sold out to Prime at the time the agreement was reached.

### 5. The Lawsuit and Following Quit-claim Deed

In May 1998, Saratoga filed this suit, seeking a refund from Baker of the expenses it claimed it had overpaid. After the suit was filed, Prime executed a quit-claim deed, in which it gave Saratoga all its rights, if any, to recover a refund of pre 1996 audit claims.

## THE MOTIONS FOR SUMMARY JUDGMENT

### 1. The Grounds Asserted

Baker filed a motion for summary judgment contending that (1) Saratoga's sale to Prime extinguished its right to recover a refund, and (2) the 1996 Normalization Agreement, which provided only for prospective application, settled the issue of expense refunds. Put simply, Baker contends that any refund due would have been owed to Prime, and that Prime, by agreeing to the Normalization Agreement, agreed that no refund would be paid.

Saratoga filed a cross-motion for summary judgment contending that, because Baker failed to respond to its audit exceptions within 180 days, as required by the Operating Agreement, Saratoga's claim for a refund was "incontestable." Alternatively, Saratoga claimed that it had reached an oral agreement with Baker that an adjustment should be made and refund given, and that the court should supply a "reasonable price" because the parties had not reached an agreement as to price.

The trial court denied Saratoga's motion and granted Baker's motion.

### 2. The Standard of Review

We apply well-known standards when reviewing a motion for summary judgment. *See Nixon v. Mr. Property Mgm't Co.,* 690 S.W.2d 546, 548–49 (Tex. 1985). When both parties move for summary judgment, each must carry its own burden of proof. *Benchmark Bank v. State Farm Lloyds,* 893 S.W.2d 649, 650 (Tex.App.—Dallas 1994, no writ). That burden is to show an entitlement to summary judgment as a matter of law by conclusively proving all the elements of the cause of action or defense. *Odeneal v. Van Horn,* 678 S.W.2d 941, 941 (Tex.1984).

When both parties move for summary judgment and the trial court grants one motion and denies the other, the unsuccessful party may appeal both the prevailing party's motion, as well as the denial of its own. *See Holmes v. Morales,* 924 S.W.2d 920, 922 (Tex.1996); *Cigna Ins. Co. v. Rubalcada,* 960 S.W.2d 408, 411–12 (Tex.App.—Houston [1st Dist.] 1998, no pet.). In that situation, we should review the summary judgment evidence presented

by both sides, determine all questions presented, and render such judgment as the trial court should have rendered. *See Commissioners Court v.. Agan,* 940 S.W.2d 77, 81 (Tex.1997).

## C. Propriety of Trial Court's Order Granting Baker's Motion

■ We begin with Baker's assertion that the 1996 sale from Saratoga to Prime extinguished any claim Saratoga might have to a refund. We agree. The sale agreement between Saratoga and Prime conveyed "all accounts receivable, security deposits, prepayments, refunds, *right to refunds,* and rebates in favor of, owing to, or possessed or controlled by the Saratoga Companies[.]" (emphasis added). Thus, any right that Saratoga had to recover a refund of the expenses it had overpaid was conveyed to Prime in the 1996 sale.

Saratoga responds that it did not convey the right to a refund of expenses because there was also language in the sale to Prime that Saratoga retained "[a]ll revenues, proceeds, receipts, and income ("Revenues") attributable to production from the Wells and the sale of the properties prior to [January 1, 1996] ... " A right to a refund of expenses is not income attributable to production from the well or sale of the properties. It is an adjustment of the expenses to be borne by each working interest owner. As such, there is no language in the sale between Prime and Saratoga to indicate that Saratoga, rather than Prime, retained the right to sue a third party for a refund of expenses it overpaid.

In fact, in Saratoga's reply brief, it alleges, "while Prime acquired the right to collect all Revenues from third parties, as between themselves, Saratoga and Prime clearly agreed that Saratoga owned the Revenues for periods prior to the Effective date, which is the date subject to this lawsuit." This apparently concedes that Prime, not Saratoga, has the right to sue third parties, such as Baker, to collect any refunds, and that such a refund collected would then be owed to Saratoga.

■ Once the right to collect a refund was transferred to Prime, Prime and Baker made an "other arrangement," as contemplated by the original Operating Agreement, to reduce Prime's share of expenses. On July 3, 1996, Prime and Baker signed a "Normalization Agreement," which reduced Prime's share of expenses from 25% to 8%. There is nothing in the summary judgment evidence, or in the Normalization Agreement itself, to indicate that the normalization was designed to have retroactive application.

The dissent argues that there is nothing in the record to show that Baker intended to "release" Prime's right to a refund when they entered into the Normalization Agreement, and that there is a fact question about whether Saratoga and Baker had an earlier agreement to modify the expenses. We respectfully disagree. The original agreement was that Saratoga [and its successor, Prime] would pay 25% of the expenses "until other arrangements" were agreed to. "Other arrangements" were agreed to when Prime and Baker entered into the July 1996 Normalization Agreement, which reduced Prime's share of the expenses to 8%, but provided for no refund. After the Normalization Agreement was reached, there simply was no refund to "release"; Saratoga/Prime's share of the expenses remained 25% until the day it was reduced to 8%.

Thus, the post-litigation quitclaim from Prime to Baker was of no effect. The quitclaim conveys only such interest as Prime possessed. *See Diversified, Inc. v. Hall,* 23 S.W.3d 403, 407 (Tex.App.—Houston [1st Dist.] 2000, pet. denied) (stating

quitclaim deed merely passes whatever interest the grantor holds). Prime held no interest in a refund at the time of the quitclaim because it had already agreed to the Normalization Agreement, which was applied prospectively only.

Thus, we conclude that Saratoga conveyed its right to a refund to Prime, and that Prime extinguished that right by agreeing to a prospective-only normalization of expenses. Because Baker has proved that Saratoga had no interest upon which to file suit, the trial court properly granted summary judgment in Baker's favor.

## D. Propriety of Trial Court's Order Denying Saratoga's Motion

Even if we were to agree that Saratoga's right to a refund was "incontestable" because of Baker's failure to respond to its audit claims within 180 days, we have already held that such right was conveyed to Prime. Similarly, if Baker and Saratoga had an oral agreement regarding a refund that was missing only a "reasonable price" term, that right to a refund, too, was conveyed to Prime.

Because Saratoga had conveyed any right that it had to recover a refund to Prime, the trial court properly denied Saratoga's motion for summary judgment.

Accordingly, we affirm the judgment of the trial court.

Justice BRISTER dissenting.

SCOTT BRISTER, Justice, dissenting.

I agree with the majority except for one point. When parties in a continuing business relationship have a dispute, they may amend their contract prospectively to resolve the problem as to future transactions. The majority holds that doing so automatically waives any prior claims, even if the amendment does not purport to settle or release them. I disagree, and because this holding affects the judgment we should render, I respectfully dissent.

I agree with the majority that, during the period between Saratoga's sale to Prime and Prime's quitclaim back to Saratoga, Prime had the authority to settle or waive the overcharge claim against Baker. The majority holds that, because the Normalization Agreement between Prime and Baker was prospective only, it must have been a waiver of the claim to amounts previously overcharged. But the Normalization Agreement contains no waiver or release of preexisting claims—they are simply not addressed.

A "release" is a writing in which an obligation owed to one party is discharged immediately or on the occurrence of a condition. *National Union Fire Ins. Co. v. Insurance Co. of N. Am.*, 955 S.W.2d 120, 127 (Tex.App.—Houston [14th Dist.] 1997), *aff'd sub nom. Keck, Mahin & Cate v. National Union Fire Ins. Co.*, 20 S.W.3d 692 (Tex.2000). In order to effectively release a claim in Texas, an instrument must mention the claim; any claims not clearly stated are not discharged. *Victoria Bank & Trust Co. v. Brady*, 811 S.W.2d 931, 938 (Tex.1991). By failing to hint that a prior claim was being released, the Normalization Agreement clearly did not do so.

I agree with the majority that Baker's tardy response to the audit does not make Saratoga's refund incontestable. At the time, Prime alone had the right to make such a claim. But as Prime never released such claims, and later reconveyed the right to Saratoga, I believe Saratoga is entitled to a decision on the merits of its refund claim.

I believe there is a fact question whether Saratoga is entitled to a refund. While an agreement to agree in the future is

unenforceable, Baker's subsequent agreement with Prime to amend the allocation of expenses exactly as Saratoga says the parties intended is some evidence that the parties reached an enforceable agreement, with certain details to be settled later. *See Scott v. Ingle Bros. Pac., Inc.,* 489 S.W.2d 554 (Tex.1972). Thus, I would reverse and remand to the trial court for further proceedings.